# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ROBERT L. TATUM,

                    Plaintiff,

           -vs-                         Case No.   11-CV-1131

DAVID A. CLARKE, JR., *et al.*,

                    Defendants.

## DECISION AND ORDER

The pro se plaintiff, Robert L. Tatum, is a Wisconsin state prisoner who filed this civil rights action under 42 U.S.C. § 1983 and was granted leave to proceed *in forma pauperis*. Tatum was confined at the Milwaukee County Jail at all times relevant to this action. On September 5, 2013, the Court granted in part and denied in part the defendants' motion for summary judgment—Tatum's retaliation and access to the courts claims were dismissed while his due process, excessive force, medical care, religion, and state law claims survived. The defendants have filed a successive motion for summary judgment as to Tatum's remaining claims, which will be addressed herein.

### SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## FACTS

### A. Preliminary Matters

Tatum contends that three of the defendants' affidavits filed in support of their motion for summary judgment—Dr. Thomas Gable's, defendant Kevin Nyklewicz's, and defendant Peter Jaskulski's—should be stricken because they contain information

2

objectionable under Federal Rules of Evidence 402, 403, 602, and 802. The defendants contend that the affidavits are proper.

Dr. Gable, who is not a defendant in this case, is the Medical Director of the Milwaukee County Jail. He submitted an affidavit based on the "the available documentation in [Tatum's] medical records dated from June 04, 2010 through June 15, 2011. (Gable Aff. ¶ 1.) However, the defendants did not provide any of Tatum's medical records. They contend that the current version of the Federal Rules of Civil Procedure does not require that a sworn or certified copy of each paper referred to in a declaration or affidavit be attached and served with the declaration or affidavit. (The former Rule 56(e)(1) required just that.) The current version of Rule 56 requires:

> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The Advisory Committee Notes provide that the "requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration is omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record. Fed. R.

3

Civ. P. 56 advisory committee note, 2010 Amendments.

Dr. Gable's entire declaration refers to Tatum's medical records, but the medical records are not provided. Dr. Gable does not have personal knowledge of Tatum's medical care. Accordingly, the Court will not consider the defendants' proposed facts that rely on Dr. Gable's affidavit. *See also* Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 803(6); 902(11). The defendants' motion for summary judgment as to Tatum's medical care and religion claims rely on Dr. Gable's affidavit. Because there are no admissible facts in support of the defendants' arguments for summary judgment as to those claims, Tatum's medical care and religion claims survive.

Tatum contends that defendant Nyklewicz's affidavit should be stricken because it contains perjury and is unreliable. However, Tatum's disagreement with the affidavit does not render it void. Nyklewicz may testify to Jail records. These documents and Nyklewicz's affidavit are admissible. *See* Fed. R. Evid. 803(6); 902(11).

Finally, Tatum does not set forth any specific objection to defendant Jaskulski's affidavit other than general assertions that it contains objectionable information. The Court will not strike the affidavit on that basis.

## B. Factual Findings[1]

Tatum was confined at the Milwaukee County Jail (Jail) from June 4, 2010 through June 15, 2011.

---

[1] This section is taken from the Defendants' Proposed Findings of Fact (Docket No. 217) and the Plaintiff's Response to the Defendants' Proposed Findings of Fact (Docket No. 230 at 1-15.).

Defendant David A. Clarke, Jr., is the Sheriff for Milwaukee County. Sheriff Clarke has never personally met Tatum and was not personally involved in any decisions relating to the conditions of his confinement at the Jail from June 4, 2010 through June 15, 2011. Sheriff Clarke was not involved in any decisions pertaining to Tatum's special diet requests, whether those requests were based on religious reasons or otherwise. Sheriff Clarke is not and was not involved in the day-to-day operational decision making of the Jail. Sheriff Clarke is not and was not aware of any systemic lapses in enforcement or policy regarding inmates' religious rights.

However, on November 1, 2010, Wisconsin State Senator Lena C. Taylor sent Sheriff a letter regarding alleged medical mistreatment of Tatum based on the diet he was receiving at the Jail. Senator Taylor's letter also advised Sheriff Clarke of an alleged excessive force incident regarding Tatum. (Tatum 3/23/13 Aff. ¶¶ 15, 39, Exh. 10.) On March 3, 2011, Ms. Linda Muhammad, Tatum's mother, sent Sheriff Clarke a letter concerning alleged mistreatment at the Jail. *Id.*

Defendant Deputy Inspector Kevin Nyklewicz was employed by Milwaukee County as a deputy inspector in the Milwaukee County Sheriff's Office (MCSO) in 2010 and 2011. He was in charge of the Jail in 2010 and 2011. Nyklewicz's duties consisted of the operation and administration of the Jail and he was charge of the day-to-day operations of the Jail.

Defendant Peter Jaskulski worked for Milwaukee County as a captain with the

MCSO at all times relevant, but is no longer employed by Milwaukee County. As a captain, Jaskulski was assigned the task of overseeing Jail Operations, was the supervisor of the special management team and Correctional Emergency Response Team ("C.E.R.T. team"), and was allowed to delegate tasks, such as responding to grievances. Jaskulski met with Tatum on two occasions during Tatum's incarceration to discuss his various issues with the Jail. After meeting with Tatum, Jaskulski decided to provide Tatum with special meal options. The parties dispute the motivation for Jaskulski's decision. According to Jaskulski, he ordered additional food as a strategy in an attempt to curb Tatum's behavior. (Jaskulski Aff. ¶ 9.) Tatum avers that the additional food was ordered to improve his weight and health due to his dramatic weight loss. (Tatum Aff. ¶ 9.)

Defendant Melissa Elliot worked for Milwaukee County as a captain with the MCSO at all times relevant, but is no longer employed by Milwaukee County. During Elliot's employment as a captain, she conducted disciplinary due process hearings, was trained in how to conduct said hearings, and made disciplinary decisions pertaining to Tatum within her professional discretion.

Defendant Abie Douglas worked for Milwaukee County as a lieutenant with the MCSO at all times relevant, but is no longer employed by Milwaukee County.

Defendant Tricia Carlson worked for Milwaukee County as a lieutenant with the MCSO at all times relevant. In that capacity, she conducted disciplinary due process hearings, was trained in how to conduct said hearings, and made disciplinary decisions

6

pertaining to Tatum within her professional discretion while assigning penalties within the ranges specified in the Inmate Handbook. (Nyklewicz Dec. ¶ 13.) According to Carlson, it is the Jail's common practice and policy to disallow inmates accused of rule violations to have any witnesses appear for their defense at disciplinary hearings, and only the accused inmate is allowed to testify. (Tatum 3/22/13 Aff. ¶ 40 [Docket 177], Exh. 21 [Docket 182-3].)

Defendants Fatrena Hale, Sarah Wronski, Thomas Trettin, Thomas Liebenthal, Gary Coleman, Bret Myers, and "John" Novotny worked for Milwaukee County as sergeants with the MCSO at all times relevant. Defendants Timothy Lorch and Mitchell Gottschalk worked for Milwaukee County as detectives with the MCSO at all times relevant.

Defendants Patrick Diggins-Davis, Dennis McKnight, Justin Georgeson, Charles Holt, Edward Horzewski, James Koscielak, Matthew Leete, "John" Woods, "Jane" Luna, Sean Henderson, Michael Leeman, DeShawn McKinley, "John" D. Smith, and Cheri Schmitz worked for Milwaukee County as corrections officers with the MCSO at all times relevant.

Defendant Tina Watts worked for Milwaukee County as a registered nurse supervisor with the MCSO at all times relevant. Defendant Chris Lubus worked for Milwaukee County as a registered nurse with the MCSO at all times relevant.

Defendant Kirk Lausterer worked for Milwaukee County as a psychiatric social worker with the MCSO at all times relevant. Defendant CERT Team LR Tim "Doe"/Calvin

7

Smith worked for Milwaukee County as a correctionsoOfficer with the MCSO at all times relevant. Tim "Doe"/Calvin Smith was a member of the C.E.R.T. team at all times relevant.

At all times relevant, the Department of Corrections (DOC) regulations that applied to the Jail regarding disciplines were contained in Wis. Admin. Code DOC 350.15.[2] Wis. Admin. Code DOC 350.15(2)(a) explains the parameters for a minor discipline, which is defined as discipline of twenty-four hours or less. The Jail refers to minor disciplines as Category I disciplines. Wis. Adm. Code DOC 350.15(3)(a) specifies a major penalty as being any one of the following:

> a. a restriction of privileges for more than 24 hours;
> b. placement in solitary confinement for more than 24 hours in accordance with Wis. Stat. Section 302.40;
> c. loss of good time in accordance with Wis. Stat. Section 303.08; or
> d. restrictions affecting work release in accordance with Wis. Stat. Section 303.065

(Nyklewicz Dec. ¶ 43, Exh. C.) The Jail refers to major disciplines as Category II through Category V infractions, and those disciplines have certain penalties; enhanced penalties can apply for repeat violations. When inmates are found to have violated any of the various Jail rules, they are housed in 4D, the disciplinary housing unit, and their privileges are restricted for a defined period of time.

All inmates are provided a copy of the Inmate Handbook upon entry in the Jail so they are aware of the expectations of the detention staff and the consequences for violating

---

[2] Effective September 1, 2014, the DOC repealed and recreated Chapter DOC 350, relating to jails. Wisconsin Admin. Code § DOC 350.15 was amended and renumbered 350.24.

various rules. A review of Jail records under Nyklewicz's control indicates that during Tatum's incarceration at the Jail, he incurred approximately eighty-five instances of rules violations. It is the responsibility of the shift deputy or other officer working the pod to submit disciplinary reports and a supervisor conducts the disciplinary due process hearings.

Forty-seven of Tatum's infractions were "in-pod disciplines" wherein Tatum was disciplined with less than twenty-four hours locked in his cell and did not require a disciplinary hearing. The remaining thirty-eight infractions are "major violations" as defined by Wis. Adm. Code DOC 350.15(3)(a) and are documented in fourteen formal discipline due process hearings. (Nyklewicz Dec. ¶ 51.)

Tatum was booked into the Jail on June 4, 2010 and housed in pod 6B. On June 6, 2010, was moved to pod 5D, a general housing pod.

On June 22, 2010, Tatum was written up for committing three rules violations: (1) disobeying verbal or written orders from sworn staff; (2) committing any act that disrupts the orderly operation of the Jail; and (3) refusing an order to lock in. (Nyklewicz Dec. ¶ 54, Exh. H.) Two violations occurring on June 22, 2010 were Category II violations and one was a Category III. Tatum was given notice of his June 22, 2010 charges and his June 29, 2010 disciplinary due process hearing on June 26, 2010. *Id.* Two of the three violations were sustained during the due process hearing. *Id.* Tatum was given a total of six days in disciplinary housing. (Nyklewicz Dec. ¶ 56.) There is no indication in the hearing officer's notes in the findings of the June 22, 2010 rules violation that Tatum requested to call a

witness and that the request was denied. (Nyklewicz Dec. ¶ 57.)   Tatum avers that he spent

ten days in 4-D, from June 22, 2010 until June 30, 2010.  (Compl. ¶¶ 46-49.)

Inmates are moved to a disciplinary pod when they violate Jail rules and/or

when the inmates are threats to themselves, staff, or the general security of the Jail.

(Nyklewicz Dec. ¶ 58.) Tatum was administratively segregated in a disciplinary pod pending

his disciplinary hearing for the rules violations on June 22, 2010 for the safety and security

of the Jail pursuant to Jail policy and procedure.  *Id.*  On June 29 or 30, 2010, Tatum was

moved out of 4D and back to the general population pod, pod 5B.

On September 22, 2010, Tatum was written up for committing the following

rules violations: (1) disobeying verbal or written orders from sworn staff; (2) committing any

act that disrupts the orderly operation of the Jail; (3) refusing an order to lock in, and (4)

committing any act that requires use of force. (Nyklewicz Dec. ¶ 63, Exh. I.)  Tatum was

administratively segregated in a disciplinary pod on September 22, 2010 pending a

disciplinary hearing on the rules violations due to jail security concerns and pursuant to Jail

policy and procedure. (Nyklewicz Dec. ¶ 66.)  Two violations occurring on September 22,

2010 were Category II violations, one was a Category III violation, and one was a Category

IV violation.  Tatum was given notice of his September 22, 2010 charges and his September

29, 2010 due process hearing in advance of the twenty-four hour notice mandated by Wis.

Adm. Code DOC 350.15(3)(c).  Three of the four violations were sustained during the

disciplinary due process hearing.  Tatum was given eighteen days of disciplinary confinement

(and six days credit for time served) for his actions on September 22, 2010. (Nyklewicz Dec. ¶ 68.) There is no indication in the hearing officer's notes in the findings of the September 22, 2010 rules violation that Tatum refused to call a witness and that the request was denied. (Nyklewicz Dec. ¶ 69.) However, Tatum avers that he requested to call witnesses but defendant Elliot denied his request. (Compl. ¶ 54.)

On September 22, 2010, the amount of force used on Tatum was justified and necessary in order to gain control over Tatum as he resisted and attempted to flee from staff. (Nyklewicz Dec. ¶ 65.) However, according to Tatum, the use of force on September 22, 2010, was "completely uncalled for and exaggerated." (Tatum 2/13/14 Aff. ¶ 6.)

On October 21, 2010, Tatum stated, "Why are you taking me to 4D, I've been locked in my cell all day," and defendant Hale informed him that he would be tazed if he did not come out of his cell. Tatum then "shielded himself with his bedmat to avoid being tazed," which resulted in Leeman spraying Tatum with Oleoresin Capsicum ("OC") spray. (Compl. ¶ 26.) Tatum finally "complied with the move" while stating, "This is a violation of my rights, I have a right to know why you are taking me to 4D, I've been in my cell all day! I haven't done anything!" (Compl. ¶ 27.) Tatum was placed in wrist-restraints to execute a pod move to 4D. (Compl. ¶ 28.)

Tatum was moved to pod 4D, the disciplinary pod, on October 21, 2010 for committing the following rules violations: (1) use of obscene language to jail staff; (2) committing any act that disrupts the orderly operation of the jail; (3) disobeying verbal or

written orders from staff; (4) committing any act that requires use of force; (5) participation in a disturbance requiring a C.E.R.T. team; (6) committing any act, which necessitates a security search; (7) threat to another person; (8) committing any act that disrupts the orderly operation of the jail; and (9) making sexual threats, proposals or gestures. (Nyklewicz Dec. ¶ 74.) Tatum denies committing any of the rule violations. (Compl. ¶¶ 16-35.)

Six violations occurring on October 21, 2010 were Category II violations, one was a Category III violation, and two were Category IV violations. (Nyklewicz Dec. ¶ 75.) Tatum was given notice of his October 21, 2010 charges and his October 28, 2010 disciplinary due process hearing on October 23, 2010. *Id.* The hearing was ultimately held on October 30, 2010. Eight of the nine violations were sustained during the disciplinary due process hearing. *Id.*

According to the defendants, use of force was justified and necessary on October 21, 2010: OC spray was necessary to gain compliance over Tatum as he was resisting a cell move from pod 5B to disciplinary housing, using his mattress as a shield as he resisted; Officer Henderson's forearm strike was necessary to gain control of Tatum as he was being resistive and combative with the officers; and decentralization of Tatum was necessary to properly gain control of him due to his continued resistive behavior. (Nyklewicz Dec. ¶ 76.) According to Tatum, the use of force was unreasonable and unjustified. He avers that Henderson and Leeman punched him repeatedly in the face while he was cuffed, restrained, and non-resistive. He also avers that their decentralization was excessive and

12

unnecessary.  (Compl. ¶¶ 28-42.)

Tatum was moved to disciplinary housing immediately following his rules violations on October 21, 2010 because of jail security concerns. (Nyklewicz Dec. ¶ 78.)

He was given a total of eleven days in disciplinary confinement in response to his October 21, 2010 rules violations.  (Nyklewicz Dec. ¶ 79.)  There is no indication in the hearing officer's notes in the findings of the October 21, 2010 rules violation that Tatum requested to call a witness and that the request was denied. (Nyklewicz Dec. ¶ 80.)[3]

The October 21, 2010 incident was investigated on October 22, 2010 and January 14, 2011 by defendants Lorch and Gottchalk, respectively.  (Nyklewicz Dec. ¶ 82.) Defendant Lorch's investigation of the October 21, 2010 incident resulted in the finding that "the amount of force used was no more then [sic] necessary to gain control of Tatum." (Nyklewicz Dec. ¶ 83.)  Defendant Gottchalk's investigation report of the October 21, 2010 incident noted that "[b]ased on previous reports, and the inconsistencies in Tatum's statements, this matter will be considered closed at this time." (Nyklewicz Dec. ¶ 84.)[4]  The officers involved in the October 21, 2010 incident were not found to have acted maliciously or willfully against Tatum, nor did they receive any form of disciplinary action for their involvement. (Nyklewicz Dec. ¶ 85.)

On October 30, 2010, Tatum was written up for committing the following rules

---

[3] Tatum asserts that there is a Jail policy to deny inmates' requests to call witnesses but he dose not assert that he requested witnesses for this hearing specifically.

[4] According to Tatum, Gottchalk's report was skewed and falsified.  (Tatum Aff. ¶ 40.)

13

violations: (1) committing any act that disrupts the orderly operation of the Jail; (2) disobeying verbal or written orders from sworn staff; and (3) use of obscene language to jail staff. (Nyklewicz Dec. ¶ 86, Exh. K.) All three violations were Category II violations. Tatum was given notice of his charges and his November 6, 2010 disciplinary due process hearing on October 30, 2010. (Nyklewicz Dec. ¶ 87.) Tatum did not move cells as a result of his October 30, 2010 rules violation as he was already housed in pod 4D, which is the disciplinary pod. He was given five days in disciplinary housing in response to the rules violations.

On November 27, 2010, Tatum was moved to the disciplinary pod, pod 4D, for committing the following rules violations: (1) committing any act that disrupts the orderly operation of the jail; (2) disobeying verbal or written orders from sworn staff; and (3) use of obscene language to jail staff. (Nyklewicz Dec. ¶ 94, Exh. L.)

On December 4, 2010, Tatum was transferred to 4B, but was still considered as being on discipline status. (Nyklewicz Dec. ¶ 96.) Pod 4B can be used for discipline overflow in the Jail if it does not have enough room in 4D and for purposes of transitioning inmates back to general population. (Nyklewicz Dec. ¶ 97.)

On January 19, 2011, Tatum was moved to a new cell within pod 4B, still on discipline status. (Nyklewicz Dec. ¶ 98.) Jaskulski decided to place Tatum in administrative segregation as there was another inmate near whom Tatum could not be housed because the other inmate was testifying against Tatum in his criminal case. (Jaskulski Dec. ¶ 7.)

14

Jaskulski's decision to place Tatum in administrative segregation was not motivated by malicious intent, but rather for the security of the Jail and the safety of the other inmate. Later in the day on January 19, 2011, Tatum was moved to pod 4D, then moved back to pod 4B in his newly assigned cell he occupied earlier that day, no longer on discipline. (Nyklewicz Dec. ¶ 98.)

On January 20, 2011, Tatum was moved to the disciplinary pod, 4D, for (1) refusing an order to lock in; (2) using obscene language to jail staff; (3) any act that disrupts the orderly operation of the jail; (4) failure to comply with classification procedures; and (5) disobeying written or verbal orders from staff. (Nyklewicz Dec. ¶ 99, Exh. M.) Tatum denies committing the violations. (Compl. ¶¶ 63-68.)

Four of the January 20, 2011 violations were Category II violations and one (1) was a Category III violation. (Nyklewicz Dec. ¶ 100.) Tatum was given notice of his charges and his January 27, 2011 disciplinary due process hearing on January 21, 2011. All five of the violations that occurred on January 20, 2011 were sustained during the due process hearing. (Nyklewicz Dec. ¶ 100.) Tatum was given a total of seven days in disciplinary confinement. (Nyklewicz Dec. ¶ 101.)

There is no indication in the hearing officer's notes in the findings of the January 20, 2011 rules violation that Tatum requested to call a witness and that the request was denied. (Nyklewicz Dec. ¶ 102.) However, Tatum asserts that his request to call witnesses was ignored pursuant to the Jail's custom. (Tatum 3/22/13 Aff. ¶ 40, Exh. 21.)

On January 27, 2011, Tatum was written up for (1) committing any act that necessitates a security search; (2) committing any act that disrupts the orderly operation of the jail; (3) disobeying verbal or written orders from sworn staff; and (4) defacing county property. (Nyklewicz Dec. ¶ 105, Exh. N.) On February 1, 2011, Tatum was transferred to Mendota Mental Health Institute for a competency evaluation. Because he was not in Jail custody at the time his due process hearing was scheduled, Tatum's January 27, 2011 rules violations were noted as time served as all inmates have the right to be present to testify at their due process hearings.

On February 17, 2011, Tatum returned from Mendota and returned to the discipline pod because of his behavior patterns: he had twenty formal discipline charges sustained and forty-one in-pod disciplines. Tatum was considered a threat to the security of the Jail. (Nyklewicz Dec. ¶ 108.)

On February 18, 2011, at 8:00 a.m., the sprinkler in Tatum's cell was activated. Tatum denied responsibility of its activation and he suspected the sprinkler "was faulty due to the last occupant of the cell." (Compl. ¶ 79.) Defendant Trettin escorted Tatum to special needs to be placed on the "RIP Bed"/restraint bed on February 18, 2011. Upon observing the "RIP Bed" Tatum claimed "he is claustrophobic and cannot be placed in such a vice." (Compl. ¶ 84.) Trettin told Tatum to "just comply," to which Tatum responded that "he could not stand being on the RIP bed for any significant amount of time." (Compl. ¶ 85.) Shortly after being placed on the RIP bed, Tatum claims to have "suffered a massive panic

attack … exclaiming the straps were hurting his arms and he needed to move to relieve his mental anguish/claustrophobia." (Compl. ¶ 86.)  During wellness checks on February 18, 2011, Tatum told defendant Lausterer that "he was claustrophobic, in intense pain, and needed to be urgently taken from the RIP bed." (Compl. ¶ 87.)  Tatum claimed he "could no longer hold the impending necessity to urinate" and urinated on himself. (Compl. ¶ 88.)  During wellness rounds on February 18, 2011 at approximately 10:00 a.m., Tatum told Lubus that "the restraints were severely hurting his arms, and [he] urgently needed to move to relieve his mental anguish/claustrophobia." (Compl. ¶ 89.)  Defendants Trettin and Novotny removed Tatum from the "RIP bed" at approximately 12:30 p.m. on February 18, 2011.  At this time, Tatum claims he "was in a mild state of shock." (Compl. ¶ 90.)  Before Tatum was removed from the RIP bed, Trettin questioned him about his involvement with the sprinkler activation. (Compl. ¶ 91.)

On February 18, 2011, Tatum was sent to special needs on the second floor of the Jail and placed in a restraint bed for committing the following acts: (1) flooding causing leakage to cells, walls or floors; (2) intentionally damaging jail security or safety of property; (3) tampering with any permanent building fixture; (4) committing any act that disrupts the orderly operation of the jail; (5) disobeying verbal or written orders from officers; and (6) defacing county property while housed in 4D. (Nyklewicz Dec. ¶ 109.)  Tatum denies committing the offenses.  (Compl. ¶¶ 79-81; Tatum 3/23/13 Aff. ¶ 31.)

According to the defendants, Tatum's placement on the restraint bed on

February 18, 2011 was due to his out of control behavior in tampering with the sprinkler. (Nyklewicz Dec. ¶ 111.) The defendants also assert that Officer Trettin's actions on February 18, 2011 were in response to Tatum's non-compliance, were not motivated by any wanton desire to inflict pain, and he was acting within his discretion to manage Tatum's conduct and his actions were in accordance with his training in dealing with a difficult inmate. *Id.* However, according to Tatum, he was placed on the restraint bed for impermissible "punitive" and malicious purposes because he did not commit the alleged offenses. (Compl. ¶¶ 79-81; Tatum 3/23/13 Aff. ¶ 19.) Tatum was returned to the disciplinary pod, pod 4D, on February 18, 2011. (Nyklewicz Dec. ¶ 112.)

During Tatum's due process hearing on the February 18, 2011 rules violations, Elliott sustained two of the six charges against Tatum (Nyklewicz Dec. ¶ 113.) Tatum was given a total of twenty-five days in disciplinary confinement. *Id.* There is no indication in the hearing officer's notes in the findings of the February 18, 2011 rules violation that Tatum requested to call a witness and that the request was denied. (Nyklewicz Dec. ¶ 114.) However, according to Tatum, Elliot refused his request to call witnesses per the Jail's custom and found him guilty without evidence. (Tatum 3/23/13 Aff. ¶ 40; Compl. ¶¶ 93-95.)

On March 11, 2011, defendants McKinley and Leete told Tatum to "put a gown on," to which Tatum stated "he needs privacy." Officers then retrieved "a cutting tool to shear [Tatum's] clothing… and attempt[ed] to remove [Tatum's] clothing by force." (Compl. ¶ 117.) After Tatum was "struggling for a short time unsuccessfully," McKinley and Leete

18

were able to change Tatum over into a gown. (Compl. ¶ 118.)

On March 11, 2011, Tatum was written up for (1) committing any act which necessitates a security search by staff; (2) committing any act that disrupts the orderly operation of the jail; and (3) disobeying verbal or written orders from officers. (Nyklewicz Dec. ¶ 116, Exh. P.) Two violations occurring on March 11, 2011 were Category II violations and one was a Category III violation. (Nyklewicz Dec. ¶ 117.) Tatum was given notice of his charges and his March 18, 2011 disciplinary due process hearing on March 14, 2011. *Id.* One of the three violations was sustained during the March 18, 2011 disciplinary due process hearing. Tatum was given a total of seven days in disciplinary confinement in response to his March 11, 2011 rules violations. (Nyklewicz Dec. ¶ 118.) Since Tatum was already in disciplinary housing on March 18, 2011, he remained in his assigned cell.

There is no indication in the hearing officer's notes in the findings of the March 11, 2011 rules violation that Tatum requested to call a witness and that the request was denied. (Nyklewicz Dec. ¶ 120.) However, according to Tatum, he requested witnesses but his request was denied per the Jail's custom. (Tatum 3/23/13 Aff. ¶ 40.)

According to the defendants, all actions taken by Officer Leete on March 11, 2011 were within his discretion to manage Tatum's conduct and were in compliance with his training and were commensurate with the need to compel Tatum to comply with the officer's directive to put on a gown. (Nyklewicz Dec. ¶ 122.) Officer Leete's actions on March 11, 2011 were in direct response to Tatum's non-compliance and were not motivated by any

wanton desire to inflict pain. (Nyklewicz Dec. ¶ 122.) According to Tatum, Leete used excessive force against him and violated the Jail's changeover policy in removing his clothes. (Tatum 3/23/13 Aff. ¶¶ 10-11; Compl. ¶¶ 110-120.)

On March 21, 2011, Tatum remained in pod 4D, but was put on maximum custody status due to his numerous rules violations and behavior status. (Nyklewicz Dec. ¶ 125.) Inmates are placed on maximum custody status when they are deemed a threat to themselves, staff, or to the general security of the Jail. (Nyklewicz Dec. ¶ 126.) On March 21, 2010, Tatum was deemed an active threat to himself, staff, and other inmates. (Nyklewicz Dec. ¶ 127.) Tatum denies that he was a threat to himself or anyone else during his confinement at the Jail. (Tatum 3/23/13 Aff. ¶ 32.)

On March 22, 2011, while housed in pod 4D, Tatum was written up for (1) use of obscene language to jail staff; (2) disobeying verbal or written orders from staff; (3) committing any act that disrupts the orderly operation of the jail; and (4) refusing an order to lock in. (Nyklewicz Dec. ¶ 129, Exh Q.) Three violations occurring on March 22, 2011 were Category II violations and one was a Category III violation. (Nyklewicz Dec. ¶ 130.) Tatum was given notice of March 22, 2011 charges and his March 29, 2011 disciplinary due process hearing on March 28, 2011. *Id.* He was given a total of twenty-one days in disciplinary housing. (Nyklewicz Dec. ¶ 131.)

There is no indication in the hearing officer's notes in the findings of the March 22, 2011 rules violation that Tatum requested to call a witness and that the request

was denied. (Nyklewicz Dec. ¶ 132.)  However, according to Tatum, defendant Carlson denied his request for witnesses at the hearing.  (Tatum Aff. ¶ 40; Compl. ¶¶ 128-129.)

On March 30, 2011, while still housed in 4D, Tatum committed the following rules violations: (1) committing any act which necessitates a security search; (2) violation of telephone or mail regulations; (3) committing any act that disrupts the orderly operation of the jail; (4) disobeying verbal or written orders from sworn staff; (5) defacing county property; and (6) use of obscene language to jail staff. (Nyklewicz Dec. ¶ 134.)  The rules violation report of the March 30, 2011 incident indicates that during a search of Tatum's cell, several small pieces of elastic that were torn from his jail uniform were found tied into a knot, approximately 24 inches of elastic was found in an envelope, and Tatum had covered his vent. (Nyklewicz Dec. ¶ 135, Exh. R.)  Tatum denies committing the rules violations. (Tatum 3/23/13 Aff. ¶ 34.)

On April 7, 2011, Tatum was moved back to the special needs pod and placed on suicide watch. (Nyklewicz Dec. ¶ 138.)  Nyklewicz decided to place Tatum on observation status, specifically suicide watch, as he had just been convicted on two counts of first degree intentional homicide. (Nyklewicz Dec. ¶ 139.) Nyklewicz felt Tatum's health and safety were at risk after receiving the April 7, 2011 guilty verdicts as the accompanying penalties can be life imprisonment.  *Id.* Nyklewicz acted within his discretion and training as a jail administrator in making the decision to place Tatum on observation status on April 7, 2011, and this placement was not motivated by malicious intent.  *Id.*  Inmates are placed

in a special needs pod when they require special monitoring because they display behavior that indicates they should not be housed in general population. (Nyklewicz Dec. ¶ 140.)

"MCJ provides no way to contact the courts, state officials, or law enforcement directly by phone. The only viable alternative is to utilize a 3rd party or 3-way call, which is how [Tatum] contacted '911'." (Compl. ¶ 135.) After Tatum completed his call to 911 on April 19, 2011, he was "ordered to lock-in his cell" for his violation of the Inmate Handbook. Tatum stated "he had a right to contact law enforcement and MCJ provides no other way than a 3rd party call." (Compl. ¶ 136.) Following Tatum's three-way call to 911 on April 19, 2011, defendant Douglas informed Tatum that he would receive a rules violation for his violation of the Inmate Handbook, and Tatum stated that he "[was] not willing to give up his legal papers or change over to 4D clothing and status." (Compl. ¶ 137.) On April 19, 2011, defendant Douglas stated "[I]f you won't change over we are going to force to you." Tatum's cell door was opened so officers could enter Tatum's cell with his 4D clothing. (Compl. ¶ 138.) Tatum put "his blanket over his face to avoid being sprayed with OC" and "a struggle ensue[d]." (Compl. ¶ 139.)

On April 19, 2011, while still housed in special needs, Tatum committed the following rules violations: (1) committing an act that results in a use of force; (2) failure to comply with classification procedures; (3) violation of phone or mail regulations; (4) disrupting orderly operation of the jail; and (5) disobeying verbal or written orders from staff.

(Nyklewicz Dec. ¶ 141.)[5]  Four of the April 19, 2011 violations were Category II violations and one was a Category IV violation.  (Nyklewicz Dec. ¶ 142, Exh. S.)  All five violations were sustained during the April 25, 2011 disciplinary due process hearing.  *Id.*

According to the defendants, the April 25, 2011 disciplinary hearing complied with the Jail's policies and procedures and the applicable laws. (Nyklewicz Dec. ¶ 142.) According to Tatum, he was denied notice of the charges.  (Niklewicz Dec. ¶ 142, Exh. S.)

Tatum was given a total of seven days in disciplinary segregation in response to his April 19, 2011 rules violations. (Nyklewicz Dec. ¶ 143.)  There is no indication in the hearing officer's notes in the findings of the April 19, 2011 rules violation that Tatum requested to call a witness and that the request was denied. (Nyklewicz Dec. ¶ 144.) However, according to Tatum, he was denied his requested witnesses per Jail custom. (Tatum 3/23/13 Aff. ¶ 40.)

According to the defendants, the amount of force used on April 19, 2011 was justified and necessary in order to gain control of Tatum as he was acting in a combative matter and was resisting officers. (Nyklewicz Dec. ¶ 146.)  Tatum, on the other hand, asserts that the initial use of force was justified but Douglas's use of excessive force once Tatum was subdued and compliant was not.  (Compl. ¶¶ 140-43.)

On May 4, 2011, Tatum was informed that "there is a new disciplinary policy,

---

[5] According to Tatum, he did not commit the acts as alleged, but only sought to contact law enforcement and obtain a restraining order to end the relentless harassment and obtain transfer to another facility.  (Compl. ¶¶ 134-37.)

that inmates accused of rules violations had to give up their bedmats from 7a-9p." Tatum did not believe this new policy and requested to see it in writing. (Compl. ¶ 152.) On May 4, 2011, Tatum stated "he also disagrees with the policy and is 'standing his ground like Rosa Parks.'" (Compl. ¶ 155.) On May 4, 2011, the "CERT Team is called, and they later arrive in riot gear and with a large OC gun." (Compl. ¶ 156.) On May 4, 2011, "CERT Team leader Tim 'Doe' identifies himself as leader and orders [Tatum] to give up his mattress." Tatum refused and stated he was "standing his ground." (Compl. ¶ 157.) On May 4, 2011, the C.E.R.T. Team opened Tatum's "food chute on his cell door and sprayed him with the OC gun." (Compl. ¶ 158.)

On May 4, 2011, Tatum committed the following rules violations: (1) committing any act which necessitates a security search, (2) tampering with any permanent building fixture; (3) threat to another person; (4) committing any act that disrupts the orderly operation of the jail; (5) disobeying verbal or written orders from sworn staff; and (6) use of obscene language to jail staff. (Nyklewicz Dec. ¶ 150, Exh. T.) Tatum changed cells after the occurrence of the violations above, but was still on disciplinary status within the special needs pod. (Nyklewicz Dec. ¶ 151.) Tim "Doe"/Calvin Smith was not disciplined for the May 4, 2011 incident. As the C.E.R.T. team lead, Tim "Doe"/Calvin Smith was within his professional judgment in choosing to apply OC spray in response to Tatum's non-compliance with orders on May 4, 2011. (Nyklewicz Dec. ¶ 154.)

On May 5, 2011, Tatum moved sub pods within the special needs pod, but

remained on disciplinary status. On May 24, 2011, Tatum's status was changed back to maximum custody status, but he remained in the special needs pod. (Nyklewicz Dec. ¶ 156.)

On May 25, 2011, Tatum committed the following rules violations: (1) violation of telephone or mail regulations; (2) committing any act that disrupts the orderly operation of the jail; (3) disobeying verbal or written orders from staff; and (4) threats to another person. (Nyklewicz Dec. ¶ 157, Exh. U.) All four of the violations were Category II violations. (Nyklewicz Dec. ¶ 158.) All four May 25, 2011 violations were sustained during the May 31, 2011 disciplinary due process hearing. *Id.*

Tatum was given a total of twenty days in disciplinary confinement in response to his May 25, 2011 rules violations. (Nyklewicz Dec. ¶ 159.) He refused to engage in any conversation or answer any questions about the violations during the May 31, 2011 disciplinary due process hearing. *Id.* Tatum questioned who Lieutenant Carlson was and protested against her conducting the disciplinary due process hearing. *Id.*

There is no indication in the hearing officer's notes in the findings of the May 25, 2011 rules violation that Tatum requested to call a witness and that the request was denied. (Nyklewicz Dec. ¶ 160.) However, according to Tatum, he requested witnesses at his hearing but his request was denied per Jail custom. (Tatum 3/23/13 Aff. ¶ 40.) Tatum also asserts that he was denied notice of the charges prior to the hearing. (Nyklewicz Dec. ¶ 157, Exh. U.)

Tatum remained in the special needs pod on May 25, 2011, but was changed

25

to disciplinary status. (Nyklewicz Dec. ¶ 162.) He was transferred to another facility on June 15, 2011.

## ANALYSIS

The defendants contend that Tatum cannot demonstrate elements necessary to prove his claims and that there is no factual basis for his claims. Tatum contends that summary judgment should be granted in his favor based on the disputed facts.

Tatum's contention that summary judgment should be granted in his favor is misplaced because his stated reason, a factual dispute, precludes summary judgment. Moreover, although Tatum's summary judgment response is titled "Pl. Response to Def. Successive Summary Judgment Motion, Motion to Strike & Motion for Summary Judgment," a summary judgment motion is not properly before the Court because Tatum did not submit proposed findings of fact in compliance with Civil Local Rule 56(b). Even if the filing were a proper motion for summary judgment, it is untimely filed and Tatum did not request an extension of time. Accordingly, the Court will not consider Tatum's summary judgment response as a motion for summary judgment.

### A. Exhaustion of Administrative Remedies

The defendants contend that Tatum failed to exhaust administrative remedies as to his due process and excessive force claims. Exhaustion of adminstrative remedies is required before filing suit. *See* 42 U.S.C. § 1997e(a).

According to the defendants, Tatum did not file any grievances regarding his

complaints of harassment and mistreatment while housed in the disciplinary housing unit, pod 4D. (Jaskulski Dec. ¶ 6.) Tatum maintains that he submitted grievances related to every instance of misconduct within this lawsuit. (Compl. ¶¶ 221-23; Tatum 2/13/14 Aff. ¶ 19.) There is a factual dispute regarding exhaustion which precludes summary judgment for the defendants. *See Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014).

A factual dispute over exhaustion normally requires an evidentiary hearing to resolve. *See Pavey v. Conley*, 544 F.3d 739, 741-42 (7th Cir. 2008). However, failure to exhaust administrative remedies is an affirmative defense. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Affirmative defenses ordinarily are raised in the defendants' answer, Fed. R. Civ. P. 8(c); *Kaczmarek v. Rednour*, 627 F.3d 586, 592 (7th Cir. 2010), though nonexhaustion can be asserted even in a motion for summary judgment if the plaintiff is not harmed by the delay, *see Hess v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 729-30 (7th Cir. 2007); *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2006).

The defendants raised exhaustion for the first time in their successive motion for summary judgment; they did not raise exhaustion in their answer or in their first motion for summary judgment. This case was filed in 2011 and permitting the defendants to raise the affirmative defense at this stage would prejudice Tatum and unduly delay this case. *See Abdullah v. Washington*, 530 F. Supp. 2d 112, 115 (D. D.C. 2008). Accordingly, exhaustion has been waived and the Court will address the merits of Tatum's due process and excessive

force claims.

**B. Due Process Claims**

### 1. Substantive Due Process

The defendants contend that to the extent Tatum advances substantive due process claims based on allegations that he was "punished" at the Jail prior to his criminal conviction, such claims fail because the defendants' actions were justified by Jail security or disciplinary reasons based on Tatum's behavior. Tatum contends that he was impermissibly punished when he was placed on the RIP restraint bed, when Nyklewicz placed him on "observation" with notice or necessity on April 7, 2011, and when Jaskulski ordered him placed on "PC status" without sufficient notice or necessity on January 19, 2011.

Pretrial detainees may not be punished for the crime for which they are being held but they may be disciplined for violating prison regulations designed to maintain order and security. *Rapier v. Harris*, 172 F.3d 999, 2003 (7th Cir. 2003). Actions taken against pretrial detainees constitute unlawful punishment if they are (1) motivated by intent to punish; (2) not reasonably related to a non-punitive purpose such as maintaining security and order or (3) an exaggerated response to that interest. *Bell v. Wolfish*, 441 U.S. 520, 538 (1979). The Court should defer to the expertise of prison officials in determining whether a restriction or condition is reasonably related to an institution's interest in maintaining security and order, unless it is clear they have overreacted. *Id.* at 540.

Tatum's April 7, 2011, placement on "observation"/suicide watch was based

28

on Nyklewicz's determination that he needed monitoring following his criminal convictions. The placement was not motivated by malicious intent. Likewise, Jaskulski decided to place Tatum in administrative segregation on January 19, 2011, based on Jail security and the safety of the other inmate who was testifying against Tatum. Finally, with regard to Tatum's placement on the RIP restraint bed, he is proceeding on a excessive force claim based on that incident and, therefore, he may not also proceed on a substantive due process claim regarding the same allegations. *See Koutnik v. Brown*, 456 F.3d 777, 781 n.2 (7th Cir. 2006) (when a particular constitutional amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that amendment, not the more generalized notion of substantive due process must be the guide for analyzing the claim). Therefore, the defendants' motion for summary judgment as to Tatum's substantive due process claims will be granted.

### 2. Procedural Due Process

The defendants contend that Tatum's procedural due process claim fails because he has not shown how the lack of opportunity to call witnesses at his disciplinary hearings harmed him. They also contend that the claim fails because the discipline charges against Tatum from his thirty-eight "major violation" infractions are documented in the fourteen formal discipline due process hearings and are supported by at least "some evidence." *See Henderson v. U.S. Parole Comm'n*, 13 F.3d 1073, 1077 (7th Cir. 1994). Tatum contends that his due process rights were violated because he was not permitted to call

29

witnesses at his disciplinary hearings.

Inmates are to receive advance written notice disciplinary charges and an opportunity to call witnesses. *Wolff v. McDonnell*, 418 U.S. 539, 454-66 (1974). However, there is no right to call witnesses at prison disciplinary hearing whose testimony would be irrelevant, repetitive, or unnecessary. *See Piggie v. Cotton*, 344 F.3d 674, 677 (7th Cir. 2003). The plaintiff is constitutionally entitled to "advance written notice of the charges, the chance to present testimony and documentary evidence to an impartial decisionmaker, and a written explanation, supported by at least 'some evidence' in the record, for any disciplinary action taken." *Lagerstrom v. Kingston*, 463 F.3d 621, 624 (7th Cir. 2006); *see Superintendent, Mass. Correctional Institution v. Hill*, 472 U.S. 445, 454 (1985); *Wolff*, 418 U.S. at 463-67; *Piggie*, 344 F.3d at 677.

According to Tatum, the Jail has a policy of denying inmates' requests for witnesses and his requests for witnesses were denied at his September 29, 2010, January 27, 2010, February 23, 2011, March 18, 2011, March 29, 2011, April 25, 2011, and May 25, 2011, disciplinary hearings. Tatum has not shown he was harmed by the alleged lack of opportunity to call witnesses with respect to his January 27, 2010, March 18, 2011, April 25, 2011, and May 25, 2011, hearings. *See Piggie*, 344 F.3d at 679 (upholding denial of prisoner's claim that he was denied right to call witness at disciplinary hearing where inmate's affidavit did not specify what witness' testimony might have been or how it would have aided defense). However, he does assert that the refusal to permit him to call witnesses

prevented him from defending against the charges with respect to his September 29, 2010, February 28, 2011, and March 29, 2011, disciplinary hearings at which he was given eighteen days, twenty-five days, and twenty-one days disciplinary confinement, respectively. (Docket 230 at 23; Docket 176 at 11-12.) Accordingly, Tatum may proceed on his due process claims as to the September 29, 2010, February 28, 2011, and March 29, 2011 disciplinary hearings. His procedural due process claims as to his January 27, 2010, March 18, 2011, April 25, 2011, and May 25, 2011, hearings will be dismissed.

## C. Excessive Force

The defendants contend that Tatum's excessive force claims must be dismissed because he was not subjected to excessive force by individual defendants and because he has not identified any official policies or customs by which he was subjected to excessive force. Tatum contends that both his official and individual capacity excessive force claims survive summary judgment.

"[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). As a consequence, "the proper inquiry" is whether the treatment of the detainee "amount[s] to punishment." *Id.* The protection afforded by the Due Process Clause is broader than that afforded to convicted prisoners under the Eighth Amendment. *See Lewis v. Downey*, 581 F.3d 467, 474 (7th Cir. 2009) ("[T]he Due Process Clause, which prohibits all 'punishment,' affords broader protection than the Eighth Amendment's protection against

only punishment that is 'cruel and unusual.'"); *id.* at 475, 581 F.3d 467 (noting that, in the excessive force context, "anything that would violate the Eighth Amendment would also violate the Fourteenth Amendment"); cf. *Forrest v. Prine*, 620 F.3d 739, 743-44 (7th Cir. 2010) (acknowledging that "[t]he Fourteenth Amendment right to due process provides at least as much, and probably more, protection against punishment as does the Eighth Amendment's ban on cruel and unusual punishment"). Of course, "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell*, 441 U.S. at 537. The relevant inquiry is whether a particular action was taken "for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538.

"[C]ourts still look to Eighth Amendment case law in addressing the claims of pretrial detainees, given that the protections of the Fourteenth Amendment's due process clause are at least as broad as those that the Eighth Amendment affords to convicted prisoners, and the Supreme Court has not yet determined just how much additional protection the Fourteenth Amendment gives to pretrial detainees." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012) (citations omitted);

> Where, as here, force is employed in the course of resolving a disturbance, the pertinent inquiry is whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. Factors relevant to that inquiry include whether jail officials perceived a threat to their safety and the safety of other inmates, whether there was a genuine need for the application of force, whether the force used was commensurate

with the need for force, the extent of any injury inflicted, and whatever efforts the officers made to temper the severity of the force they used. *See also Forrest v. Prine*, 620 F.3d 739, 744-45 (7th Cir. 2010); *Lewis v. Downey*, 581 F.3d 467, 475-77 (7th Cir. 2009).

*Kingsley v. Hendrickson*, 744 F.3d 443, 451 (7th Cir. 2014) (quoting *Rice*, 675 F.3d at 668).

Tatum contends that defendants used unconstitutional excessive force against on eight separate occasions at the Jail; September 22, 2010, excessively tight hand-cuffing resulting in hand/wrist injury; October 21, 2010, attack by two correctional officers and OC spray resulting in head injuries; February 18, 2011, excessive restraints resulting in injuries; March 5, 2011, battery and assault resulting in serious medical condition; March 11, 2011, forced stripping and punches by correctional officer resulting in injuries; April 19, 2011, excessive force; May 4, 2011, OC spray and forced stripping; and May 26, 2011, excessive restraints based on placement on "RIP restraint watch" for over forty-eight hours. (Tatum Br. at 25.) In addition, on November 1, 2010, Senator Taylor contacted Sheriff Clarke regarding an alleged excessive force incident involving Tatum.

The defendants contend that any force used against Tatum was necessary to maintain order in the Jail and that no defendant used force maliciously or sadistically to cause harm. Tatum, on the other hand, contends that impermissible excessive force was used against him on each instance. Despite Tatum's multiple run-ins with officers and extraordinary number of disciplinary violations over the course of his confinement at the Jail, the Court cannot make credibility decisions at this stage of the proceedings. Accordingly,

his individual and official capacity excessive force claims survive.

**D. State Law Claims**

The defendants contend that they are immune from liability regarding any state law claims. Tatum contends that the defendants committed the torts of assault, battery, intentional and negligent infliction of emotional distress, and invasion of privacy, and that they are not immune from liability.

Section 893.80(4) of the Wisconsin Statutes bars suits against public employees based on acts performed in the exercise of "legislative, quasi-legislative, judicial or quasi-judicial functions." The acts covered by immunity are generally known as discretionary acts. *Estate of Thurman v. City of Milwaukee*, 197 F. Supp. 2d 1141, 1151 (E.D. Wis. 2002) (citing *Johnson v. City of Milwaukee*, 41 F. Supp. 2d 917, 932 (E.D. Wis. 1999)). The general rule is that public employees are immune from acts within the scope of their public office. *Id.* (citing *Barillari v. City of Milwaukee*, 194 Wis.2d 247, 533 N.W.2d 759 (1995)).

Wisconsin recognizes four exceptions to the general rule of immunity articulation in § 893.80(4). Immunity does not apply to the performance of (1) ministerial duties; (2) duties to address a "known danger;" (3) action involving medical discretion; and (4) actions that are "malicious, willful and intentional." *Thurman*, 197 F. Supp. 2d at 1151 (citing *Willow Creek Ranch, L.L.C. v. Town of Shelby*, 235 Wis.2d 409, 425, 611 N.W.2d 693 (2000)). "Malice" in the legal sense connotes "wrongful intention" as in "[t]he intent, without justification or excuse, to commit a wrongful act." *Id.* (quoting Black's Law

34

Dictionary 968 (7th ed. 1999)). "Reckless disregard of the law or of a person's legal rights" can also constitute malice. *Id.*

Taking the facts in this case in the light most favorable Tatum, a reasonable jury could find that the defendants' conduct was malicious, willful, and intentional. According to Tatum, the defendants used excessive force without justification on multiple occasions. Thus, summary judgment on Tatum's assault and battery claim must be denied.

Summary judgment is also improper with regard to Tatum's emotional distress claim because the claim is based in large part on facts gleaned from Dr. Gable's stricken affidavit. Accordingly, the Court will deny summary judgment as to that claim at this stage.

Tatum's privacy claim is based on allegations that was "forced to strip" in front of others on March 11, 2011, and May 4, 2011, when he had to change clothes However, the defendants involved in these claims are protected by discretionary immunity. *See Thurman*, 197 F. Supp. 2d at 1151. Accordingly, Tatum's privacy claim will be dismissed.

**E. Summary**

In sum, the defendants' motion for summary judgment will be granted with respect to Tatum's substantive due process claims, procedural due process claims related to his January 27, 2010, March 18, 2011, April 25, 2011, and May 25, 2011, disciplinary hearings, and privacy claims. The defendants' motion for summary judgment will be denied as to Tatum's medical care claims, religion claims, procedural due process claims related to the September 29, 2010, February 28, 2011, and March 29, 2011 disciplinary hearings,

excessive force claims, assault and battery claims, and intentional and negligent infliction of emotions distress claims.

## Additional Motion

Tatum has filed an "Emergency Request for Hearing and Sanction, Comtempt Proceedings, Extension to File Reply Brief, Request for G.J. Investigation." However, this filing is not related to claims upon which he is proceeding in this case. Moreover, his request for extension of time is related to another case upon which he is proceeding in this district. As this filing has not bearing on this action, it will be denied.

## ORDER

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (Docket # 216) is **granted in part and denied in part** as set forth herein.

**IT IS FURTHER ORDERED** that the plaintiff's motion for hearing, sanctions, contempt, extension of time, investigation (Docket # 238) is **denied**.

Dated at Milwaukee, Wisconsin, this 23rd day of September, 2014.

**SO ORDERED,**

**HON. RUDOLPH T. RANDA**
**U. S. District Judge**