# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ROBERT L. TATUM,**
                    **Plaintiff,**

        **v.**                                            **Case No. 11-C-1131**

**EARNELL R. LUCAS,[1] et al.,**
                    **Defendants.**

---

## DECISION AND ORDER

Robert L. Tatum, proceeding *pro se*, commenced this action in 2011, alleging claims under 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and state law. His claims arise out of his approximately one-year period of confinement at the Milwaukee County Jail. The case was originally assigned to Judge Rudolph T. Randa, who presided over the case until he stopped hearing cases in June 2016. A short time later, the case was reassigned to me. At the time of reassignment, the case was supposedly ready for a jury trial. However, upon reviewing the file, I realized immediately that the case was not ready for trial. The complaint alleged dozens of claims against more than 30 defendants. Judge Randa, in a series of orders, had granted summary judgment on some claims but found that others should proceed to trial. However, he did not identify with precision the claims that survived summary

---

[1] The complaint alleges claims against David A. Clarke, Jr., in his official capacity as the Sheriff of Milwaukee County. Clarke is no longer the Sheriff of Milwaukee County. Pursuant to Federal Rule of Civil Procedure 25(d), the current Sheriff, Earnell R. Lucas, has been automatically substituted as the defendant to Tatum's official-capacity claims. Thus, I will order the caption amended to reflect this change. Moreover, because the complaint does not state any claim against Clarke in his personal capacity, he will be dismissed as a party.

judgment and did not identify which defendants were parties to the surviving claims and which defendants were parties only to claims that had been dismissed. Like me, the defendants were confused by Judge Randa's summary-judgment orders and offered to file a motion for reconsideration of those orders to enable me to better identify the claims that should proceed to trial, if any. I agreed with the defendants' proposal and granted them leave to file the motion for reconsideration, which they have done. The plaintiff has filed a response to the motion. I address that motion in this order, along with the plaintiff's latest motion for sanctions (ECF No. 459).

## I. Background

In early June 2010, Tatum was arrested on two charges of first-degree intentional homicide. At that time, he entered the Milwaukee County Jail as a pretrial detainee. Tatum was found guilty of both homicides on April 7, 2011, and he was sentenced to two consecutive life terms on June 10, 2011. Tatum continued to be detained at the jail until June 15, 2011, when he was transferred to state prison.

On December 13, 2011, Tatum filed the complaint in this action. The complaint narrates a series of mostly unrelated grievances against more than 30 individuals at the Milwaukee County Jail, including correctional officers, healthcare providers, county detectives, and the Sheriff himself. The grievances relate to a variety of issues, including denial of a religious diet, improper medical care, use of excessive force, denial of procedural due process during disciplinary hearings, use of improper bodily restraints, denial of access to the courts, and retaliation for engaging in protected activity. The complaint also alleges state-law claims, including intentional infliction of emotional distress and invasion of privacy. The complaint does not reveal any

overarching theory that connects all claims (although the plaintiff tried to supply such a theory after filing the complaint). Instead, the complaint is an attempt to bring every grievance that arose during his time at the jail in a single suit. Thus, an initial question is whether the plaintiff's disparate claims were properly joined in a single action. If they were not, then the next question is what to do about the misjoinder at this late stage of the proceedings. I address these questions below.

## II. Joinder/Misjoinder

Federal Rules of Civil Procedure 18 through 21 govern joinder of claims and parties. In the present case, the rules that matter are Rules 18(a) and 20(a)(2). Rule 18(a) allows a party to assert as many claims as it has against an opposing party, regardless of whether they are related. However, before applying Rule 18(a), a court must ensure that all defendants are properly joined under Rule 20(a)(2). *See UWM Student Ass'n v. Lovell*, 888 F.3d 854, 863 (7th Cir. 2018) ("the Rule 20 inquiry comes first"). Under Rule 20, multiple defendants may be joined if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). These rules are broad, giving district courts considerable flexibility in managing and structuring civil litigation for fair and efficient resolution of complex disputes. *UWM Student Ass'n*, 888 F.3d at 863. Still, there are limits. "Unrelated claims against different defendants belong in different suits." *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007).

Here, there is no doubt that the complaint asserts unrelated claims against different defendants. Here is just one example. The plaintiff alleges a claim under the Free Exercise Clause of the First Amendment against a correctional officer named James Koscielak, in which he accuses Koscielak of mocking his religious beliefs. Compl. ¶¶ 188, 247. The plaintiff also alleges a claim for inadequate medical care against a nurse at the jail named Tina Watts, in which he accuses her of failing to properly treat a head injury that he suffered during a use-of-force incident involving other correctional officers. *Id.* ¶¶ 36, 248. Obviously, these claims are completely unrelated, and no question of law or fact common to both claims will arise in the action. The plaintiff attempts to connect his unrelated claims by asserting that every defendant's unlawful conduct was motivated by a conspiracy to retaliate against him for practicing his religion. *See* ECF No. 9 at 1–2. But the complaint itself does not plead that a retaliatory conspiracy involving every defendant existed. Moreover, while the claim against Koscielak at least involves the plaintiff's religion, the claim against Watts does not. And the complaint does not give rise to a reasonable inference that Watts decided to improperly treat the plaintiff's head injury in order to retaliate against him for practicing his religion.

Nonetheless, Judge Randa allowed the plaintiff to proceed with his misjoined claims under the retaliatory-conspiracy theory, finding that "Tatum's claims all flow from the initial denial of a religious diet." *See* ECF No. 3 at 3.[2] I disagree with this ruling, but I cannot turn the clock back to 2011 and correct the error. Although the defendants ask me to dismiss the entire complaint for misjoinder, that would never have been a proper

---

[2] Judge Randa would later grant summary judgment to the defendants on the plaintiff's retaliation claim involving his religion.

remedy, even in 2011, because "[m]isjoinder is not a ground for dismissing an action." Fed. R. Civ. P. 21. What would have been a proper remedy in 2011 is an order dismissing the misjoined claims without prejudice. *See UWM Student Ass'n*, 888 F.3d at 864. But dismissing the misjoined claims without prejudice is no longer an available remedy. The Seventh Circuit has stated that a district court should not dismiss a misjoined claim when the statute of limitations would prevent the plaintiff from refiling the claim in a separate suit. *See Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000). All of Tatum's claims accrued in 2011 or earlier, but the statute of limitations for civil-rights claims in Wisconsin is six years. *See Malone v. Corrections Corp. of America*, 553 F.3d 540, 542 (7th Cir. 2009). Thus, Tatum's misjoined claims could not be re-filed in separate suits at this time.

The one remedy for misjoinder that remains available is severance. *See* Fed. R. Civ. P. 21; *UWM Student Ass'n*, 888 F.3d at 864; *Elmore*, 227 F.3d at 1012. However, judicial efficiency would not be served by an order severing all claims in the complaint into separate suits at this late stage of the case. Judge Randa already adjudicated many of the claims on the merits. Moreover, because the defendants have filed a motion for reconsideration that essentially serves as a motion for summary judgment on the remaining claims, it makes sense to decide that motion before severing claims. If any claims survive the defendants' motion, and those claims involve defendants who are not properly joined under Rule 20, then I will consider severing the surviving claims.

### III. Identification of Claims Adjudicated by Judge Randa

To identify the claims that remain in this suit, I begin by identifying those claims that Judge Randa disposed of in his two opinions on the defendants' prior motions for

summary judgment. In his first opinion, Judge Randa granted summary judgment to the defendants on all claims for denial of access to the courts and all claims for retaliation. *See* ECF No. 192 at 16–20. The plaintiff agrees that Judge Randa granted summary judgment on all access-to-courts claims and on the overarching retaliatory-conspiracy claim that formed the basis for Judge Randa's joinder decision. *See* ECF No. 449 at 6. However, he disputes that Judge Randa granted summary judgment on any other retaliation claim, including a retaliation claim that relates to an excessive-force incident alleged to have occurred on October 21, 2010. But Judge Randa granted summary judgment on *all* retaliation claims, and he expressly identified the retaliation claim involving the October 21 incident as one of the claims he disposed of. ECF No. 192 at 20. Thus, I understand Judge Randa to have granted summary judgment on each and every retaliation claim in this case.

In his opinion on the defendants' second motion for summary judgment, Judge Randa dismissed additional claims. First, he granted summary judgment on all claims that were labelled "substantive due process." ECF No. 240 at 28–29. He identified these claims as follows: (1) a claim that, on April 7, 2011, the date on which Tatum was found guilty of the two homicides, defendant Kevin Nyklewicz unlawfully placed him on suicide watch; (2) a claim that, on January 19, 2011, defendant Peter Jaskulski unlawfully placed Tatum on "PC status," *id.* at 28; and (3) a claim that, on some unidentified date, some unidentified defendant unlawfully placed Tatum on an "RIP restraint bed," *id.*[3]

---

[3] In the section of his opinion discussing the substantive-due-process claims, Judge Randa does not identify the date on which Tatum was placed on the RIP bed or the person or persons he considered to be defendants to that claim. However, in the fact section of his opinion, Judge Randa describes an incident involving an RIP bed that occurred on February 18, 2011, involving defendants Thomas Trettin, Kirk Lausterer, Chris Lubus, and James Novotny. *See* ECF No. 240 at 16–17.

However, with respect to the RIP bed, Judge Randa wrote that he was not granting summary judgment on that claim to the extent Tatum was alleging that it amounted to a use of excessive force. *Id.* at 29.

Second, Judge Randa purported to grant summary judgment on some claims that were labelled "procedural due process." *Id.* at 29–31. Judge Randa understood Tatum to be claiming that his right to due process in jail disciplinary proceedings was violated because jail officials (whom Judge Randa did not identify by name) refused his requests to call witnesses at certain disciplinary hearings. Judge Randa wrote that he was granting summary judgment on this claim to the extent it involved disciplinary hearings on January 27, 2010, March 18, 2011, April 25, 2011, and May 25, 2011. *Id.* at 30. However, as far as I can tell, the complaint contains no allegations relating to disciplinary hearings that occurred on these dates. Indeed, Tatum was not even in the jail on January 27, 2010—he was not arrested until early June 2010—so obviously no hearing could have occurred on that date. In any event, I do not understand the plaintiff to be pressing any claims relating to hearings on these dates. I do understand the plaintiff to be pressing due-process claims relating to hearings that occurred on September 29, 2010, February 23, 2011, and March 29, 2011, but Judge Randa expressly did not grant summary judgment on any procedural-due-process claims involving these hearings. ECF No. 240 at 31.[4] I will address Tatum's procedural-due-process claims relating to these hearings later in this order.

---

[4] Judge Randa identified one of the surviving claims as involving a hearing on February 28, 2011. ECF No. 240 at 31. However, this appears to have been an error, and I believe that he meant to write that the hearing occurred on February 23, 2011. *See id.* at 30; *see also* Compl. ¶ 93 (alleging that a hearing occurred on February 23, 2011).

Finally, Judge Randa dismissed the plaintiff's state-law invasion of privacy claims. ECF No. 240 at 35. Judge Randa identified these claims as involving incidents in which correctional officers forced him to strip in front of others. He wrote that these incidents occurred on March 11, 2011 and May 4, 2011. *Id.* Judge Randa did not identify the person or persons he deemed to be defendants to these claims. However, based on the allegations of the complaint, I believe that the defendants to the March 11 incident were Deshawn McKinley and Matt Leete, Compl. ¶¶ 110, 117, and that the defendant to the May 4 incident was a Doe defendant who has since been identified as Calvin Smith, *id.* ¶¶ 152, 160.

In sum, I consider Judge Randa to have granted summary judgment on the following claims: (1) all access-to-courts claims; (2) all retaliation claims; (3) a claim that, on April 7, 2011, defendant Kevin Nyklewicz unlawfully placed Tatum on suicide watch[5]; (4) a claim that, on January 19, 2011, defendant Peter Jaskulski unlawfully placed Tatum on "PC status"; (5) a claim involving the "RIP restraint bed," but only to the extent it is asserted as a substantive-due-process claim and not an excessive-force claim; (6) a state-law invasion-of-privacy claim against defendants Deshawn McKinley and Matt Leete arising out of events that occurred on March 11, 2011; and (7) a state-law invasion-of-privacy claim against defendant Calvin Smith arising out of events that occurred on May 4, 2011.

---

[5] The plaintiff, in his brief in opposition to the defendants' motion for reconsideration, asks me to reconsider Judge Randa's grant of summary judgment on this claim. *See* ECF No. 449 at 19. However, the plaintiff's argument on this point is so perfunctory that I cannot meaningfully evaluate it. Therefore, I will not reconsider this claim. *See* *Anderson v. Hardman*, 241 F.3d 544 (7th Cir. 2001).

## IV. Identification of Claims that Survived Summary Judgment

I next identify the claims that Judge Randa did not dispose of in his rulings on the defendants' two motions for summary judgment. I also identify the defendants to each surviving claim. Finally, I identify two claims that Judge Randa identified as having survived summary judgment but which do not appear to ever have been a part of this case.

First, the plaintiff survived summary judgment on his official-capacity claim for damages under RLUIPA involving the denial of a religious diet. Because, under RLUIPA, governmental officials are not liable for damages in their personal capacities, the only proper defendant to this claim is the Sheriff in his official capacity. *See Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012); *Nelson v. Miller*, 570 F.3d 868, 885–89 (7th Cir. 2009).[6]

Second, the plaintiff has individual-capacity claims for damages under the Free Exercise Clause against correctional officers who allegedly mocked his religious beliefs. The defendants to these claims are James Koscielak and Sean Henderson. *See* Pl. Br. in Opp. to Mot. for Reconsideration at 14, ECF No. 449.

Third, in his brief in opposition to the defendants' motion for reconsideration, the plaintiff claims that he did not receive adequate medical care after he refused to eat the food served to him by the jail and embarked on a hunger strike in which he also refused to drink fluids. *See* ECF No. 449 at 15–16; *see also* Compl. ¶¶ 170–75, 179, 182, 185–

---

[6] The plaintiff concedes that he may only proceed on an official-capacity claim under RLUIPA but argues that a Wisconsin statute governing indemnification of public officers for acts performed within the scope of their employment somehow expands the scope of liability under RLUIPA. *See* ECF No. 449 at 11–12 (citing Wis. Stat. § 895.46). However, the indemnification statute does not make anyone other than the Sheriff a proper defendant to the RLUIPA claim.

86, 195, 201–02. The plaintiff does not, either in his complaint or in his latest brief, identify the medical providers who might be defendants to this claim. *See* Compl. ¶¶ 226–50 (identifying causes of action); ECF No. 449 at 15–16. The complaint does contain allegations against individuals identified only as unknown nurses, but the plaintiff did not identify these nurses during discovery, and Judge Randa denied the plaintiff's untimely request to identify them just before trial. *See* ECF No. 291 at 1–2. Thus, they are not currently defendants. It seems that, at this point, the plaintiff asserts this claim against the Sheriff in his official capacity, arguing that the provision of inadequate medical care during his hunger strike and refusal to eat the food served to him in disciplinary housing was the result of an official policy or practice, thus rendering the Sheriff liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). In any event, I do not need to identify the defendants to this claim because, for the reasons explained in the analysis section below, the plaintiff has not produced evidence that would allow a reasonable trier of fact to find that the plaintiff did not receive proper medical care for the effects of his hunger strike and refusal to eat prison food.

Fourth, the plaintiff has a claim for improper medical care against Tina Watts, a nurse at the jail, relating to her alleged failure to properly treat a head injury that the plaintiff suffered on October 21, 2010, when correctional officers used force on him.

Fifth, the plaintiff has claims for denial of procedural due process at disciplinary hearings that occurred on September 29, 2010, February 23, 2011, and March 29, 2011. In each claim, the plaintiff alleges that he was denied due process because the hearing officer did not allow him to call witnesses that he requested. I consider the

plaintiff to be asserting personal-capacity claims against the hearing officers who denied the requests and an official-capacity claim against the Sheriff on the theory that he maintained a policy of denying witnesses in all disciplinary hearings. The hearing officer for the September 29 and February 23 hearings was Melissa Elliott, and the hearing officer for the March 29 hearing was Tricia Carlson.

Sixth, in his brief in opposition to the defendants' motion for reconsideration, the plaintiff contends that Judge Randa overlooked a different claim for denial of procedural due process. ECF No. 449 at 19. In this claim, the plaintiff contends that the jail had a policy of punishing pretrial detainees for disciplinary violations prior to their disciplinary hearings. That is, he contends that, as soon as jail staff issued an inmate a conduct report, staff would transfer that inmate to disciplinary housing; a hearing on the conduct report would not be held until after the inmate was already in disciplinary housing. The plaintiff contends that this policy violated procedural due process. I consider this claim below, with the understanding that because it is a policy claim the only defendant is the Sheriff in his official capacity. (Also, the plaintiff does not identify any potential defendants to this claim other than the Sheriff. *See* Compl. ¶ 234.)

Seventh, Judge Randa did not grant summary judgment on the plaintiff's claim involving the "RIP restraint bed" to the extent that it was asserted as an excessive-force claim. However, as discussed below, I think this claim is better characterized as one for denial of due process. In any event, the claim survives in some form. The incident involving the restraint bed occurred on February 18, 2011, and, according to the plaintiff, the person who made the decision to place the plaintiff on the restraint bed was Thomas Trettin. Compl. ¶¶ 81–82, 236. Accordingly, he is a defendant to this claim in

his personal capacity. Moreover, the plaintiff contends that the Sheriff had a policy of using the restraint bed as punishment, and thus the Sheriff in his official capacity is also a defendant.

Eighth, the plaintiff has a claim involving an alleged incident in which two correctional officers, Decorie Smith and Deshawn McKinley, placed a urine-soaked restraint belt on the plaintiff's bare skin. Smith and McKinley are the only defendants to this claim. (The plaintiff alleges that James Novotny refused to investigate this incident, but that, by itself, would not have violated the plaintiff's constitutional rights. Thus, Novotny is not a defendant to this claim.)

Ninth, the plaintiff has a claim for use of excessive force against correctional officers who were involved with an incident on October 21, 2010, in which the plaintiff was punched in the face and had his head slammed into an elevator wall. The defendants to this claim are Sean Henderson, Michael Leeman, Fatrena Hale, and Sarah Wronski.

Tenth, the plaintiff has a claim for use of excessive force against correctional officers who forcibly removed the plaintiff's clothing and changed him into a gown that inmates on suicide watch must wear. The plaintiff alleges that the officers used excessive force by punching him during this incident. The incident occurred on March 11, 2011, and the defendants to this claim are Deshawn McKinley and Matt Leete.

Eleventh, the plaintiff has a claim for use of excessive force against a correctional officer who, on April 19, 2011, restrained the plaintiff in a manner that caused him to suffer a claustrophobic panic. The defendant is Abie Douglas.

Twelfth, the plaintiff has a claim for use of excessive force during an incident that occurred on May 4, 2011, in which the plaintiff was sprayed with oleoresin capsicum spray ("OC spray"). Although the plaintiff does not identify the defendant who sprayed him with OC spray, I construe this claim as being against defendant Calvin Smith, who was the team leader of the cell-extraction team that sprayed OC spray into the plaintiff's cell.

The plaintiff also asserts state-law claims for assault and battery and intentional and negligent infliction of emotional distress that Judge Randa did not dismiss. *See* ECF No. 40 at 34–35. However, I will not attempt to identify the underlying facts and defendants for these claims because, as discussed in more detail below, all of the plaintiff's state-law claims must be dismissed because the plaintiff failed to comply with Wisconsin's notice-of-claim statute before commencing this action.

Finally, Judge Randa identified certain claims as surviving summary judgment that, as far as I can tell, have never been a part of this case. First, Judge Randa wrote that the plaintiff could proceed with an excessive-force claim involving an incident that occurred on September 22, 2010. *See* ECF No. 240 at 33. But there are no allegations in the complaint alleging that any defendant used excessive force against the plaintiff on this date. Moreover, in their motion for reconsideration, the defendants note that the plaintiff alleged no facts concerning an excessive-force incident on September 22, 2010, and they ask me to clarify what specific acts form the basis for this claim. ECF No. 437, at 64. In his response brief, the plaintiff does not identify any acts that might form the basis for this claim, and I am not aware of any. For these reasons, I conclude that the

plaintiff has not asserted a claim for excessive force that occurred on September 22, 2010.

Second, Judge Randa wrote that the plaintiff could proceed with a claim for use of excessive force involving the placement of the plaintiff on "RIP restraint watch" for over 48 hours on May 26, 2011.[7] *See* ECF No. 240 at 33. However, no allegations relating to this claim appear in the complaint. Moreover, the plaintiff has not identified any potential defendant to this claim. Although the plaintiff describes an incident involving RIP restraint watch in one of his declarations, *see* ECF No. 177 ¶ 12, he does not identify the person or persons involved in the incident. Thus, I conclude that the plaintiff cannot proceed on a claim involving RIP restraint watch.

## V.  Analysis of Surviving Claims

I next consider whether summary judgment should be granted on the surviving claims. Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

Because the individual defendants have asserted qualified immunity from personal-capacity damages claims, I briefly summarize the legal standards governing

---

[7] To prevent confusion, I note that "RIP restraint watch" is something different than the "RIP restraint bed" discussed above. The RIP restraint bed was a bed with four-point restraints that prevented an inmate from moving at all. *See* Compl. ¶ 82. In contrast, RIP restraint watch is a form of in-cell restraint in which the inmate is not strapped to a bed but has his or her wrists restrained. *See* Tatum Decl., March 22, 2013, ¶ 12, ECF No. 177.

this defense. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

## A. RLUIPA Claim for Denial of Religious Diet

RLUIPA provides that no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1(a). In general, an institution's refusing to provide an inmate with a nutritious diet that complies with restrictions associated with his or her religious beliefs will be found to substantially burden the inmate's religious exercise. *See Nelson*, 570 F.3d at 879 ("We have held that a prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition.").

In the present case, the plaintiff alleges that, as soon as he arrived at the jail in early June, he requested a meatless diet for religious reasons. Compl. ¶¶ 165, 167.[8] He

---

[8] Because the plaintiff's complaint is verified, I will give it the same effect as a declaration or affidavit. *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017). Thus, any

contends that, despite his request, the jail did not provide him with a nutritious diet that met his religious restrictions during the many times that he was confined in disciplinary housing (which the plaintiff identifies as "4D"). Instead, he contends, the jail provided him only with a food known as Prison Nutraloaf, which, he believes, contained meat.

The Sheriff contends that the plaintiff was provided with a nutritious meat-free diet while he was in disciplinary housing. Specifically, he contends that the plaintiff received meatless Nutraloaf. The plaintiff, however, believed that the Nutraloaf he received contained meat, and for this reason he refused to eat it while he was in disciplinary housing. Because the jail would not serve the plaintiff anything other than Nutraloaf while he was in 4D, the plaintiff did not eat anything at all during his several stays in that wing of the jail. *See* Compl. ¶ 201.

The Sheriff is entitled to summary judgment on this claim. The plaintiff has not pointed to evidence giving rise to a genuine dispute as to whether the Nutraloaf he received contained meat. The plaintiff states that, on June 25, 2010—soon after he was first transferred to 4D—a medical staff member told the plaintiff that the "food loaf" he was receiving did not contain meat. Compl. ¶ 169. The plaintiff immediately concluded that the staff member was lying, but the plaintiff provides no evidentiary support for his belief that the staff member was lying, *see id.* He does not, for example, state that he personally observed or tasted meat in the Nutraloaf that was served to him prior to the time the staff member made this statement. Moreover, jail logs relating to the plaintiff

---

facts stated in the complaint of which the plaintiff has personal knowledge, that would be admissible in evidence, and that relate to matters the plaintiff is competent to testify about, may be used to oppose the defendants' motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(4).

contain numerous entries stating that the plaintiff was served meatless nutraloaf for his meals in 4D. *See* Tatum Decl., March 22, 2013 Ex. 11, 16 ECF No. 177-10.

The plaintiff does claim to have observed meat in the Nutraloaf on one occasion, but this was not until October 8, 2010, *see* Compl. ¶ 189, and the plaintiff does not claim to have observed meat in the Nutraloaf on any other occasion. The Sheriff would not have substantially burdened the plaintiff's religious practice by serving him meat-containing Nutraloaf for only one meal. And it would have been unreasonable for the plaintiff to refuse to eat Nutraloaf during his entire time in the jail based on his observing meat in his Nutraloaf on only one occasion.

The plaintiff also contends that jail records show that "no meatless order was in for me to receive meatless loafs." Tatum Decl. ¶ 16, ECF No. 177. The record he cites is the same jail log stating that the plaintiff routinely received meatless Nutraloaf, ECF No. 177-10. However, two entries in this log state that, on October 7, 2010, jail staff called "Medical" regarding his order for meatless Nutraloaf and that someone named Barbara Walker called back and said that "they" do not have an order "down there" for the plaintiff and that "it is up to Security to decide if [plaintiff] should be placed on a meatless nutraloaf." *Id.* at 2. This entry is vague and does not give rise to a factual dispute over whether the plaintiff was served meatless Nutraloaf. The entry could mean that medical staff did not order meatless Nutraloaf for the plaintiff for medical reasons and that, if the plaintiff needed meatless Nutraloaf for religious reasons, the order would have to come from "Security." The statement does not show that "Security" failed to transmit an order to the kitchen for the plaintiff to receive meatless Nutraloaf. (To the contrary, the record contains two orders from Security to the kitchen asking that the

plaintiff be served meatless Nutraloaf while he was in 4D. ECF No. 182-1 at 2–3.) Thus, the entry, by itself, does not show that the Nutraloaf the plaintiff received was not meatless. For the entry to support the plaintiff's case, it would need to be clarified by a witness with knowledge of the entry's meaning, such as by the jail staff member who created the entry or by Barbara Walker, the person to whom the statement in the entry is attributed. But the plaintiff has not cited to clarifying statements from these witnesses, and therefore he has not established a genuine dispute of fact on this matter. On this record, a factfinder could only speculate as to the meaning of the entry, and speculation is not sufficient to avoid summary judgment. *See, e.g., Amato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (at the summary-judgment stage, "[i]nferences that rely upon speculation or conjecture are insufficient").

In his brief in opposition to the defendants' motion for reconsideration, the plaintiff also contends that even if the Nutraloaf he received was meatless, eating it would still have violated the dietary tenets of his religion. *See* ECF No. 449 at 14. However, the plaintiff does not identify any ingredient in meatless Nutraloaf that would have violated his religious tenets. Instead, he simply cites a list of the dietary restrictions imposed by his religion (which is Nation of Islam, or "NOI," Muslim) and then a list of the ingredients in meat-containing Nutraloaf. *Id.* (citing ECF No. 177 ¶ 37 & ECF No. 177-5). Other than meat, I do not see any ingredient on the list that would violate the NOI tenets cited by the plaintiff. Moreover, no evidence suggests that the meatless version of Nutraloaf contained the exact same non-meat ingredients as the meat-containing version. Thus, even if the meat-containing version used a non-meat ingredient that the plaintiff could not eat, the record would not enable a reasonable factfinder to conclude that the

meatless version also contained that ingredient. Lastly, I note that the plaintiff does not claim to have told jail staff that he could not eat meatless Nutraloaf because it contained a non-meat ingredient that was against his religious dietary tenets. Rather, as far as the record reveals, the only ingredient in Nutraloaf that the plaintiff ever complained to staff members about was meat. For these reasons, the plaintiff cannot avoid summary judgment based on his claim that meatless Nutraloaf would not have satisfied his religious dietary needs.

Accordingly, I will grant summary judgment to the Sheriff on the plaintiff's RLUIPA claim.

## B. Free Exercise

The plaintiff contends that two correctional officers, James Koscielak and Sean Henderson, violated his rights under the Free Exercise Clause of the First Amendment by harassing and retaliating against him for his religious beliefs. *See* ECF No. 449 at 14. As noted above, Judge Randa already granted summary judgment to the defendants on the plaintiff's retaliation claims, so the only remaining issue is whether Koscielak and Henderson violated the First Amendment by harassing the plaintiff about his religious practices.

The plaintiff contends that, on October 7, 2010, while he was in his cell, Koscielak used the intercom system to mock the plaintiff's refusal to eat Nutraloaf for religious reasons. Compl. ¶¶ 185, 188. The plaintiff makes similar claims against Henderson. He states that, on October 9, 2010, Henderson used the intercom system to mock the plaintiff's religion and the fact that he had not eaten in 20 days. *Id.* ¶ 190. He states that Henderson did this again on October 11, 2010. *Id.* ¶ 192.

The plaintiff has not cited, and I have not found, a case holding that a correctional officer's mocking an inmate's religious practices violates the Free Exercise Clause. The defendants have cited a case from the Western District of Wisconsin in which the court found that correctional officers did not violate the First Amendment by mocking Muslim inmates while they were in prayer. *See Bonner v. McCallum*, No. 01-C-487, 2001 WL 34373164, at *11 (W.D. Wis. Nov. 16, 2001). The court reasoned that, while the correctional officers' conduct may have been "crass and insensitive," it did not amount to a constitutional violation so long as the inmates were still able to practice their religion. *Id.* at 11. I find this reasoning persuasive. Moreover, like the inmates in *Bonner*, the plaintiff does not contend that the defendants' mocking his religion prevented him from practicing his religion. Although the plaintiff correctly notes that the government's pressuring a person to modify his behavior and violate his beliefs can result in a constitutional violation, *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008), here the conduct the plaintiff describes was not so pervasive as to amount to such pressure. The mocking behavior occurred on only three occasions, and the plaintiff does not claim that he considered abandoning his religious practices and beliefs as a result. At the very least, given the absence of clearly established law on when mocking a person's religious practices rises to the level of a constitutional violation, the correctional officers would be entitled to qualified immunity.

Accordingly, summary judgment will be granted to Koscielak and Henderson on this claim.

**C.      Claim for Lack of Adequate Medical Care for Hunger Strike/Weight Loss**

The plaintiff next contends that he did not receive adequate medical care during the times when he refused to eat the food served to him in the jail. The plaintiff's medical records show that he was regularly seen by medical staff during his time in the jail, including when he was refusing food and fluids. *See generally* ECF No. 443. However, the plaintiff contends that his right to adequate medical care was violated by medical staff's failure to seek a court order to forcibly feed and hydrate him once his weight dropped to 125 pounds. *See* ECF No. 449 at 15–16.

A claim by a pretrial detainee that he received inadequate medical care arises under the Due Process Clause of the Fourteenth Amendment. *McCann v. Ogle County, Ill.*, 909 F.3d 881, 886 (7th Cir. 2018). To prevail on such a claim, a pretrial detainee must show that the medical care he or she received was objectively unreasonable. *Id.* This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable. *Id.* However, a pretrial detainee cannot prevail by showing that the defendant was merely negligent. *Id.* at 887.

As discussed above, the plaintiff does not target any specific medical provider at the jail and allege that the care provided by him or her during the times when he was refusing to eat and losing weight was deficient. Rather, he seems to claim that the staff at the jail generally failed to adequately care for him during these times. This makes it difficult to evaluate whether any specific defendant acted with objective unreasonableness. The standard for liability requires the court to focus on "the totality of

facts and circumstances faced by the individual alleged to have provided inadequate medical care," *McCann*, 909 F.3d at 887, and because the plaintiff does not identify any potentially liable individual, the court cannot focus on the facts and circumstances faced by that individual.

In any event, the record complied by the plaintiff does not enable a reasonable factfinder to infer that any medical provider (or group of medical providers) at the jail acted with objective unreasonableness in failing to seek a court order to forcibly feed and hydrate him when his weight dropped. The essential problem is that the plaintiff has not presented evidence showing that the only objectively reasonable response to his condition was to seek a court order to permit forced feeding and hydration.

Because the plaintiff focuses on his weight,[9] I provide an overview of his weight during his time in the jail. When the plaintiff entered the jail, he weighed 132 pounds. *See* ECF No. 443-1 at 68; ECF No. 443-4 at 107 ("When [plaintiff] came to MCJ in June he weighed 132 pounds and he is 6'1""). The plaintiff gained weight during his first few months at the jail. *See* ECF No. 443-2 at 89 (medical record showing weight of 150 pounds on 9/9/10). However, during an extended period in which he was housed in 4D, he lost weight. It appears that he reached a low weight of 125 pounds on October 12, 2010. ECF No. 443-4 at 63. By October 25, 2010, the plaintiff had regained some weight and was back to 135 pounds. *Id.* at 119. On October 26, 2010, the plaintiff met with a physician, Roger Benson, M.D., about his weight loss and his refusal to eat Nutraloaf. ECF No. 443-5 at 20. On that date he weighed 138 pounds. *Id.* The physician

---

[9] The plaintiff also notes that he refused fluids, *see* Compl. ¶ 175, but he does not point to any evidence suggesting that he refused fluids for such an extended period of time that an order for forced hydration was needed. Thus, I focus on the plaintiff's weight and his refusal to eat.

found that the plaintiff was medically stable but that he was "certainly at the lower end of the BMI [Body Mass Index] scale and even slightly below normal." *Id.* The physician entered an order for medical staff to evaluate the plaintiff twice per week and weigh him once per week. *Id.* On November 5, 2010, the plaintiff met with Dr. Benson for a follow-up appointment about his weight. *Id.* at 65. On that date, Dr. Benson diagnosed him with "[m]oderately severe weight loss" but found that he was medically stable. *Id.* Dr. Benson then described the following plan:

> Discussed possible approaches to his regaining some of his lost weight. If allowed by correctional dietary department and permitted by current rules, he may try to eat some of his trays and receive in addition a bag lunch containing the items he can and will consume. He at this point does not want any supplements to his diet such as multivitamins or iron. He also wants to wait on getting blood tests to assess his nutritional status. Will follow up periodically.

*Id.* This plan seems to have been successful. By November 16, 2010, the plaintiff was back to 150 pounds, *see id.* at 94, and he continued to gain weight from there, *see id.* at 142 (weight of 174 pounds on January 7, 2011). As far as the medical records reveal, the plaintiff's weight remained over 150 pounds for the remainder of his time at the jail.

Nothing in the plaintiff's medical file suggests that at any time his weight was so low that forced feeding was the only reasonable course of action. Moreover, the plaintiff has not presented his own evidence showing that forced feeding was necessary. Instead, he contends that jail staff should have sought an order for forced evaluation, feeding, and hydration because that is what the Wisconsin Department of Corrections ("DOC") did in two instances in which his weight dropped into the 120s while he was in state prison. The plaintiff attaches to his brief court records from two cases—one from 2015 and one from 2016—in which state courts granted the DOC's petitions to forcibly evaluate and, if necessary, feed and hydrate the plaintiff. *See* ECF No. 449-1 at 1–10.

But these records do not create a genuine dispute over whether jail staff acted unreasonably by not seeking similar orders. This is so because the plaintiff has not shown that the circumstances facing jail staff in 2010 and 2011 were the same as the circumstances facing the DOC in 2015 and 2016. *See McCann*, 909 F.3d at 886 (objective reasonableness is evaluated based on the totality of the circumstances faced by the defendant). Moreover, the records themselves reveal one significant difference between the circumstances the DOC faced and the circumstances jail staff faced: during his hunger strikes at the DOC, the plaintiff refused medical evaluation and treatment. *Id.* at 1, 3–4, 7–8. The plaintiff does not claim to have refused medical evaluation and treatment at the jail. To the contrary, his medical records show that he was seen by medical staff at the jail numerous times during his hunger strikes, and no record that I have found mentions that he refused necessary treatment. Thus, while the DOC needed to obtain a court order to evaluate the plaintiff, jail staff did not. Finally, I note that even if jail staff faced the same circumstances as the DOC, it would not follow that the course of action chosen by the DOC was the only reasonable course of action, as medical professionals exercising sound judgment may take different approaches to the same circumstances. *Cf. Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) (noting that difference of opinion among medical professionals is not enough to establish deliberate indifference).

For these reasons, the plaintiff has not shown that jail staff members acted unreasonably in their treatment of his hunger strikes and weight loss. Likewise, the plaintiff has not shown that the Sheriff had a policy or practice of providing inadequate medical care to inmates on hunger strikes or who are otherwise in medical danger due

to lack of nutrition or hydration. In his brief, to show the existence of a policy or practice, the plaintiff references an instance in which a detainee at the jail died of dehydration. *See* ECF No. 449 at 16. But the plaintiff submits no admissible evidence regarding the circumstances of this inmate's death. In any event, because the plaintiff has not shown that the care he received was inadequate, he could not prevail on a claim against the Sheriff even if he had established the existence of a policy or practice. *See Horton v. Pobjecky*, 883 F.3d 941, 954 (7th Cir. 2018) ("[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee."). In short, I will grant summary judgment to the defendants on all of the plaintiff's claims relating to the medical care he received during periods when he was refusing food and fluids.

## D. Claim Against Nurse Watts Regarding Treatment for Head Injury

The plaintiff next contends that defendant Tina Watts, a nurse at the jail, failed to properly treat him for a head injury he suffered after correctional officers used force on him on October 21, 2010. (This use-of-force incident is the subject of a separate claim that I discuss below.) According to the plaintiff's verified complaint, after the use-of-force incident, Nurse Watts came to evaluate him. Compl. ¶ 36. He states that although he had sustained serious and obvious head injuries, Nurse Watts "ordered no medical safeguards to avoid concussion or sudden death." *Id.* However, the plaintiff does not identify any specific safeguard that Nurse Watts should have ordered at that time. Nor does he point to evidence showing that the failure to order any specific safeguard was objectively unreasonable. *See McCann*, 909 F.3d at 886. Moreover, the plaintiff's medical records show that, on the same day that he sustained the head injury, as well

as on the day after, other medical staff members attended to the plaintiff's head injury. *See* ECF No. 443-4 at 65–97. The records show that, among other forms of treatment, staff at the jail performed "neuro checks" during the 24 hours following the plaintiff's injury. *Id.* at 69, 73, 90, 95. The plaintiff has not argued or shown that the totality of the treatment he received for his head injury was inadequate. Accordingly, I will grant summary judgment to Nurse Watts on this claim.

## E. Claim for Denial of Witnesses During Disciplinary Hearings

I next address the plaintiff's claim for denial of procedural due process relating to jail staff's refusal to allow him to call witnesses during disciplinary hearings held on September 29, 2010, February 23, 2011, and March 29, 2011. The law on this topic is clearly established: "Inmates have a due process right to call witnesses at their disciplinary hearings when doing so would be consistent with institutional safety and correctional goals, but there is no right to call witnesses whose testimony would be irrelevant, repetitive, or unnecessary." *Piggie v. Cotton*, 344 F.3d 674, 677 (7th Cir. 2003) (internal citations omitted). When an institution denies an inmate's request for a witness, the burden is on the institution to state a reason for the denial, either on the record at the disciplinary hearing or later when the inmate challenges the denial in court. *Ponte v. Real*, 471 U.S. 491, 498–99 (1985); *Piggie v. McBride*, 277 F.3d 922, 925 (7th Cir. 2002).

The plaintiff contends that, during his detention at the jail, the jail maintained a blanket policy of denying all inmate requests for witnesses at disciplinary hearings. I conclude that the plaintiff has established a genuine dispute on this point. Indeed, one of the plaintiff's hearing officers, defendant Tricia Carlson, admitted that "it is [the jail's]

common practice & policy to disallow inmates accused of rule violations to have any witnesses appear for their defense at disciplinary hearings, and only the accused inmate is allowed to testify." *See* Carlson Resp. to Request to Admit #6, ECF No. 182–3. Moreover, the plaintiff in his verified complaint states that at each of the disciplinary hearings at issue, his requests for witnesses were denied. He states that, at the September 29, 2010 hearing, his request to call inmate witnesses and the correctional officer who wrote the conduct report was denied. Compl. ¶ 54. He states that, at the February 23, 2011 hearing, his request to call witnesses was denied. *Id.* ¶ 93. And he states that, at the March 29, 2011 hearing, his request to call inmates who witnessed the events at issue was denied. *Id.* ¶ 128. Thus, the plaintiff has established a genuine dispute on the issue of whether he was denied his right to call witnesses. Moreover, the defendants offer no permissible reason for denying the plaintiff's requests, such as institutional safety or irrelevance, and therefore the plaintiff has established a genuine dispute over whether the denials of his requests for witnesses resulted in due-process violations. *See Ponte*, 471 U.S. at 498–99.

The defendants contend that even if the plaintiff has established a genuine dispute on the above issues, he has not shown that he was actually harmed by the denial of his requests for witnesses. The defendants cite *Piggie v. Cotton*, in which the Seventh Circuit recognized that harmless-error analysis applies to prison disciplinary proceedings. *See* 344 F.3d at 678. But *Piggie v. Cotton* was a habeas case, *id.* at 676, not a § 1983 case for damages. In a § 1983 case, unlike in a habeas case, a showing that a constitutional violation was harmless does not defeat a plaintiff's claim for relief. Rather, in a § 1983 case, if a procedural-due-process violation occurred, but the plaintiff

cannot show actual injury, the plaintiff is entitled to a judgment for nominal damages. *See Farrar v. Hobby*, 506 U.S. 103, 112 (1992). *Carey v. Piphus*, 435 U.S. 247, 266–67 (1978). Here, because the plaintiff has established a genuine dispute over whether his requests for witnesses were denied, and because the defendants have not offered permissible reasons for denying those requests, the plaintiff survives summary judgment on this claim even if he cannot show that the denial of witnesses resulted in actual injury. Accordingly, this claim may proceed against the Sheriff in his official capacity and against defendants Elliott and Carlson in their personal capacities.

## F. Claim Regarding Imposition of Punishment Prior to Disciplinary Hearings

I next consider the plaintiff's claim that he was routinely "punished" for rules infractions before the jail provided him with due process. Unlike convicted prisoners, pretrial detainees cannot be punished for the crimes of which they have been accused. *See Bell v. Wolfish*, 441 U.S. 520, 535–36 (1979). However, a pretrial detainee may be "punished for misconduct that occurs while he is awaiting trial in a pretrial confinement status." *Rapier v. Harris*, 172 F.3d 999, 1003 (7th Cir. 1999). Still, such punishment may be imposed "only after affording the detainee some sort of procedural protection." *Id.* at 1005.

In the present case, the plaintiff contends that he was entitled to a full disciplinary hearing prior to being transferred to disciplinary housing (also known as "4D") for rules violations. However, his claim presents two problems. First, the plaintiff simply assumes that every time he was transferred to 4D, he was being punished for a rules violation. But not every transfer of a pretrial detainee to a more restrictive form of detention amounts to punishment. A jail might have a legitimate, non-punitive justification for the

transfer, *see Rapier*, 172 F.3d at 205, which could include removing an unruly detainee from the general population pending a full hearing on whether the detainee committed a rules violation, *see Holly v. Woolfolk*, 415 F.3d 678, 681 (7th Cir. 2005) (noting that it is "dangerous to allow a prisoner who the guards have probable cause to believe has violated a disciplinary rule to roam at large in the general jail population"). Here, the plaintiff makes no attempt to show that his immediate transfers to 4D were punishment rather than precautions to prevent the plaintiff from engaging in further unruly behavior before hearings could be held on the alleged violations.

Second, the plaintiff acknowledges that he received a disciplinary hearing on each rules violation within seven days of being transferred to 4D. Compl. ¶¶ 44, 49, 54, 79, 93, 121, 128. The Seventh Circuit has held that a pretrial detainee may be transferred to more restrictive forms of confinement for short periods before a disciplinary hearing is held. *Holly*, 415 F.3d at 680–81. In *Holly*, the plaintiff received a hearing within 48 hours of being transferred to more restrictive confinement. *Id.* In the present case, the plaintiff was held for as much as seven days without a hearing. However, *Holly* does not hold that 48 hours is the maximum allowable length of pre-hearing detention, and the plaintiff has developed no argument showing that seven days is too long. *See* ECF 449 at 19. Instead, he simply assumes that *any* pre-hearing detention in 4D would be unconstitutional, which, as I have shown, is not the case. Accordingly, I conclude that the plaintiff has forfeited any claim that pre-hearing detention for seven days or less amounted to a due-process violation. *See Anderson v. Hardman*, 241 F.3d 544, 545–46 (7th Cir. 2001) (explaining that even pro se litigants must develop arguments in support of their claims).

### G. Claim involving Use of Restraint Bed

I next consider the plaintiff's claim involving his placement on the "RIP bed." This is a form of shackling, which the plaintiff describes as follows: "a person is strapped to a floor mat in 'spread eagle' fashion, their hands, feet, and torso cuffed and tightly bound with harnesses so the person cannot move at all, sometimes accompanied by a muzzle or face guard. The straps [a]re doubled around the arms at the bicep, which contract and both cut off circulation and cause intense pain in the arms." Compl. ¶ 82.

The plaintiff states that he was placed on the RIP Bed for over four hours on February 18, 2011. Compl. ¶¶ 79–91, 236. The events leading to his restraint began when the sprinkler in his cell was activated, causing a minor flood in the jail. Correctional officers determined that the plaintiff had intentionally activated the sprinkler because he was upset that he was in 4D and serving disciplinary time. *See* ECF No. 225-2 at 5. When correctional officers arrived at the plaintiff's cell, they put him in a restraint belt and brought him to a different area of the jail. Compl. ¶ 80; ECF No. 225-2 at 5. Defendant Trettin then brought the plaintiff to the "special needs" area of the jail and placed him on the RIP bed. Compl. ¶ 82; ECF No. 225-2 at 5. The plaintiff remained on the bed in four-point restraints for four hours. The plaintiff does not claim to have been muzzled.

As noted above, Judge Randa dismissed the plaintiff's claim involving the restraint bed to the extent that it was brought as a due-process claim, but he let the claim proceed as an excessive-force claim. Although the claim could properly be characterized as either an excessive-force claim or a due-process claim, *see Davis v. Wessel*, 792 F.3d 793, 798–800 (7th Cir. 2015), in my view the claim fits more naturally

under the Due Process Clause, which forbids a jail from using bodily restraints on a pretrial detainee in a manner that constitutes punishment. *See May v. Sheehan*, 226 F.3d 876, 884 (7th Cir. 2000); *Murphy v. Walker*, 51 F.3d 714, 717–18 (7th Cir. 1995). But, in this case, the claim could also be characterized as one for excessive-force because an unreasonable use of restraints on a pretrial detainee qualifies as a use of excessive force. *See Davis*, 792 F.3d at 799 (noting that "excessive use of restraints" is a subspecies of excessive force).

Under either the due-process or the excessive-force approach, the plaintiff survives summary judgment on his personal-capacity claim against Trettin. This is so because Trettin has not offered any non-punitive reason for placing the plaintiff on the RIP bed. Indeed, the defendants concede that the plaintiff was placed on the RIP bed as a form of "discipline" (i.e., punishment) for activating the sprinkler in his cell. ECF No. 437 at 66–7 ("It is undisputed . . . that Plaintiff was placed in the RIP Bed for disciplinary reasons"). Moreover, no non-punitive reason for Trettin's decision is apparent from the record. By the time Trettin made the decision to place the plaintiff on the restraint bed, correctional officers had already removed the plaintiff from his cell and put him in a restraint belt. There is no evidence that, after the plaintiff was removed from his cell and put in the belt, he continued to struggle in a manner that would have made the use of four-point restraints reasonable. There is no evidence that, at that time, the plaintiff was a danger to himself or others. *See Murphy*, 51 F.3d at 718 (noting that shackling an inmate to the floor is an "extreme measure" that may only be used "on violent inmates who pose a threat to others or suicidal inmates who pose a threat to themselves"). And even if Trettin's initial decision was reasonable (and I repeat that the record does not

show that it was) nothing in the record suggests that the decision to leave the plaintiff in four-point restraints for over four hours was reasonable or served any legitimate, non-punitive purpose. Thus, the plaintiff has established a genuine dispute over whether Trettin's decision to place him in the restraint bed and leave him there for over four hours amounted to a constitutional violation.[10]

Trettin asserts that he is entitled to qualified immunity from this claim. However, it was clearly established before 2011 that a pretrial detainee may not be shackled for punitive reasons. *May*, 226 F.3d at 884; *Murphy*, 51 F.3d at 717–18. Indeed, in *May*, which the Seventh Circuit decided in 2000, the court expressly stated that "precedent establishes that pretrial detainees may not be shackled without a good penological or medical reason." 226 F.3d at 884. Accordingly, Trettin is not entitled to qualified immunity.

Although the plaintiff may proceed on his personal-capacity claim against Trettin, the Sheriff is entitled to summary judgment on the plaintiff's official-capacity claim involving the restraint bed. The plaintiff asserts that, in 2010 and 2011, it was a common practice at the jail to use the RIP bed as a form of punishment. However, he presents no evidence that supports this assertion. He points to no incident other than his own on February 18 in which the RIP bed was used as punishment rather than for permissible purposes. Thus, he has not shown a genuine dispute over whether an unwritten policy or custom existed under which inmates were placed on the RIP bed for punishment.

---

[10] The plaintiff also alleges that other defendants are liable in their personal capacities because they checked on him while he was in the restraint bed. However, the record does not show that any of these other defendants knew that Trettin had placed the plaintiff in the bed for impermissible reasons, and therefore they could not be liable for failing to intervene and remove him from the bed. Thus, only the personal-capacity claim against Trettin survives summary judgment.

Moreover, the jail maintained a written policy expressly forbidding the use of restraints as punishment. *See* ECF 440-1 at 58. The policy expressly stated that "full restraints" could be applied to an inmate only when he posed an imminent threat of physical injury to either himself, other inmates, of jail staff. *Id.* at 59. For these reasons, the Sheriff is entitled to summary judgment on this claim.

## H. Claim Involving Urine-Soaked Restraint Belt

The plaintiff claims that two correctional officers, Decorie Smith and Deshawn McKinley, made him wear a restraint belt that was soaked with urine. According to the plaintiff, on March 5, 2011, these officers came to his cell, put him in handcuffs, lifted his shirt, and then applied the restraint belt to his bare skin. Compl. ¶¶ 99–100. The plaintiff noticed that the belt was wet and asked the officers why that was so. The officers acted nervous and quickly left the cell. *Id.* ¶ 101. The plaintiff smelled the hand he had used to touch the belt and found that it smelled like urine. *Id.* ¶ 102. He then removed the belt from his body, smelled it, and found that it too smelled like urine. *Id.* The plaintiff claims to have contracted Chlamydia from the urine on the belt. *Id.* ¶ 108.

The facts alleged in the plaintiff's verified complaint create a genuine dispute over whether the defendants placed the belt on the plaintiff's bare skin with knowledge that it was contaminated with urine. Moreover, if the officers engaged in this conduct, they would be liable to the plaintiff under the due-process clause, as no legitimate, non-punitive reason could justify such conduct. *See, e.g., Smith v. Dart*, 803 F.3d 304, 309–10 (7th Cir. 2015). And this conduct was so obviously unconstitutional that the officers would not be entitled to qualified immunity.

The defendants, however, contend that the plaintiff has submitted no admissible evidence showing that he contracted Chlamydia from the restraint belt. Although the defendants are correct on this point, it does not entitle them to summary judgment on the entire claim. Whether the plaintiff contracted Chlamydia from the belt relates to damages. Even if the plaintiff did not contract Chlamydia from the belt, the defendants would still be liable for nominal damages and any other compensatory damages the plaintiff could establish. Accordingly, the plaintiff may proceed on this claim against Smith and McKinley in their personal capacities.

**I. Claims for Use of Excessive Force**

I next discuss the plaintiff's claims for excessive force. The Supreme Court recently clarified the standard governing use of force against a pretrial detainee. *See Kingsley v. Hendrickson*, __ U.S. __, 135 S. Ct. 2466 (2015). However, because the defendants assert qualified immunity and the conduct at issue occurred in 2010 and 2011, I will summarize the legal standard as it existed prior to *Kingsley*.

Claims involving the use of excessive force against a pretrial detainee arise under the Due Process Clause of the Fourteenth Amendment. S*ee Forrest v. Prine*, 620 F.3d 739, 744 (7th Cir.2010). When jailers are accused of using excessive force, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Several factors are relevant to this determination, including the need for force, the amount applied, the threat a guard reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury caused to the prisoner. *Id.*

### 1. October 21, 2010 elevator incident

According to the plaintiff's verified complaint, on October 21, 2010, defendants Henderson and Leeman came to the plaintiff's cell and told him they were taking him to disciplinary housing. Compl. ¶ 23. The plaintiff told the officers that he had not done anything to warrant such a transfer, and he refused to comply with their orders. *Id.* ¶¶ 24–26. Two other correctional officers, Fatrena Hale and Sarah Wronski, came to the plaintiff's cell. Hale ordered Wronski to point her taser at the plaintiff, and then defendant Leeman sprayed the plaintiff in the face with OC spray. *Id.* At this point, the plaintiff stopped resisting and complied with orders. *Id.* ¶ 27. The four officers placed him in handcuffs and a restraint belt and escorted him to an elevator. *Id.* ¶ 28.

According to the plaintiff, when the elevator door opened, Henderson suddenly grabbed the plaintiff and "rammed him head first into the back wall of the elevator, then punched him in the face." *Id.* ¶ 29. Leeman also punched the plaintiff in the face. *Id.* ¶ 30. The plaintiff states that the two officers punched him in the face about eight times, nearly knocking him unconscious and blacking both of his eyes. *Id.* The plaintiff states that the two officers continued to slam the plaintiff's head into the side and floor of the elevator, causing him to break a tooth and a blood vessel in his eye. *Id.* ¶ 31. He states that Henderson and Leeman then placed their entire weight on his head, causing him severe pain. *Id.* ¶ 32. He states that defendants Hale and Wronski watched this entire incident but did not intervene. *Id.* ¶ 33.

The plaintiff contends that Henderson and Leeman's actions in the elevator amounted to excessive force, and that Hale and Wronski are liable for failing to intervene. (I do not understand the plaintiff to be claiming that the use of OC spray was

excessive force.) The defendants contend that they are entitled to summary judgment on this claim because the force they used was a reasonable response to the plaintiff's resistance. However, at summary judgment, I must accept the facts in the plaintiff's verified complaint (which, as noted, functions as a declaration) as true. And the plaintiff expressly states that he was in restraints and fully compliant at the time the officers used force in the elevator. Under the plaintiff's version of events, the use of force was obviously excessive, and therefore Henderson and Leeman would be liable and not entitled to qualified immunity. Moreover, under the plaintiff's version, Hale and Wronski would be liable for failure to intervene and would not be entitled to qualified immunity. Therefore, the plaintiff may proceed with these claims against Henderson, Leeman, Hale, and Wronski.

### 2. March 11, 2011 forced-changing incident

On March 11, 2011, a social worker at the jail ordered that the plaintiff be placed on suicide watch. Compl. ¶ 114. As part of his transfer to suicide watch, the plaintiff was required to remove his clothes and change into a gown. *Id.* ¶ 117. Defendants McKinley and Leete, along with nondefendant Vance, were the correctional officers who ordered the plaintiff to change into the gown. After the plaintiff refused to obey their orders, the officers forcibly removed the plaintiff's clothing and dressed him in the gown. *Id.* ¶¶ 117–18. While the plaintiff was struggling against the officers, Leete punched the plaintiff in the hands and midsection. *Id.* ¶ 118. I understand the plaintiff to be claiming that these punches amounted to a use of excessive force. However, the plaintiff admits that he was struggling against the officers at the time Leete used force. The plaintiff submits no evidence suggesting that this use of force was motivated by an intent to punish rather

than to stop the plaintiff from struggling against them. Nor does he cite any factually similar case holding that the use of such force under such circumstances is unconstitutional. Moreover, the Seventh Circuit has recognized that jail officials may use force when an inmate refuses to comply with an order. *Rice ex rel. Rice v. Correctional Med. Servs.*, 675 F.3d 650, 667–68 (7th Cir. 2012). Accordingly, the plaintiff has not established a genuine dispute as to whether the use of force was excessive, and the officers involved are entitled to qualified immunity.

### 3. April 19, 2011 restraint that caused claustrophobic panic

On April 19, 2011, the plaintiff called 911 from his cell to complain about his treatment at the jail. Compl. ¶ 134. Defendant Abie Douglas, a correctional officer, wrote the plaintiff a conduct report for this behavior and told the plaintiff that he was being transferred to 4D. *Id.* ¶¶ 136–37. The plaintiff refused to comply with Douglas's orders relating to the transfer to 4D. *Id.* ¶ 137. Douglas then entered the plaintiff's cell with two other correctional officers who are not defendants to this case. *Id.* ¶ 138. The plaintiff hid behind a blanket to avoid being sprayed with OC spray and then struggled against the officers. *Id.* ¶139. Eventually, the plaintiff complied. *Id.* ¶140. Defendant Douglas then restrained the plaintiff by pressing his knee and bodyweight on the plaintiff's head. At the same time, the other correctional officers held the plaintiff by the arms and legs. *Id.* ¶ 141. The plaintiff states that this "awkward and confined position" caused him to go into a "claustrophobic panic." *Id.* ¶ 142. He states that he told Douglas that he felt claustrophobic and asked to be stood up, but that Douglas refused to release him. *Id.*

I understand the plaintiff to be claiming that Douglas used excessive force by refusing to release the plaintiff once he claimed that the position in which he was being

restrained was triggering his claustrophobia. However, Douglas restrained the plaintiff immediately after the plaintiff refused Douglas's orders regarding his transfer to 4D. Although the plaintiff claims to have agreed to comply with the order before Douglas initiated the restraint, it is reasonable for an officer to restrain an inmate who had just finished resisting an order. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) ("Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest."). Moreover, the plaintiff cites no evidence showing that, at the time Douglas initiated the restraint, he was aware that the plaintiff was claustrophobic. The plaintiff claims to have told Douglas that he was claustrophobic while he was being restrained, but of course an officer is not required to release an inmate any time he claims that he is claustrophobic. Perhaps if the plaintiff had been diagnosed with claustrophobia and the diagnosis was made known to correctional officers, Douglas could be liable for restraining the plaintiff in a manner that caused a claustrophobic panic. But here there is no evidence of such a diagnosis or that, if there was one, Douglas was aware of it. At the very least, Douglas would be entitled to qualified immunity. Accordingly, summary judgment will be granted on this claim.

### 4. May 4, 2011 use of OC spray

On May 4, 2011, a correctional officer named Casarez (who is not a defendant) came to the plaintiff's cell and told him that the jail had adopted a new policy under which inmates would be required to surrender their mattresses between 7:00 a.m. and 9:00 p.m. The plaintiff told Casarez that he did not believe that this was true and asked

to see the policy in writing. Casarez told the plaintiff that he did not have the policy in writing. Compl. ¶ 152. The plaintiff refused to surrender his mattress.

Casarez left, and a short time later another correctional officer named Worzalla (not a defendant) came to the plaintiff's cell and told him that if he did not surrender his mattress a cell-extraction team would be called to retrieve the plaintiff's mattress by force. *Id.* ¶ 154. The plaintiff refused to surrender his mattress, telling Worzalla that he disagreed with this new policy and that he would be "standing his ground like Rosa Parks." *Id.* ¶ 155. Worzalla called the cell-extraction team.

The cell extraction team came to the plaintiff's cell with a "large OC gun." *Id.* ¶ 156. The leader of the team, Calvin Smith, again ordered the plaintiff to surrender his mattress. *Id.* ¶ 157. The plaintiff refused, stating that he was "tired of all the harassment and illegal procedures he is subject to in [the jail]." *Id.* Members of the cell-extraction team then used the large gun to spray OC spray into the plaintiff's cell through the food chute. *Id.* ¶ 158. The OC spray caused the plaintiff to choke and experience intense pain. *Id.* He then complied with the order to surrender his mattress. *Id.* ¶ 159.

The plaintiff contends that the use of OC spray to gain his compliance with the order to surrender his mattress amounted to excessive force. Obviously, however, it did not. The plaintiff, by his own admission, repeatedly refused to comply with the order to surrender his mattress, and the plaintiff was repeatedly warned that, if he did not comply, jail staff would use force to retrieve the mattress. Despite these warnings, the plaintiff continued to disobey, resulting in the use of OC spray. As discussed above, cases recognize that it is not unreasonable to use force to gain an inmate's compliance with an order. The plaintiff does not identify any lesser form of force that could have

been used to gain his compliance with the order. Thus, on this record, the only possible conclusion is that the use of OC spray was not excessive force.

The plaintiff contends that the use of OC spray could have been avoided if jail staff had simply shown him the written policy stating that inmates were required to surrender their mattresses during the day. ECF No. 449 at 21–22. However, I am unaware of any authority suggesting that jail staff must show inmates a written copy of a jail rule before they may use force to obtain the inmate's compliance with an order to obey the rule, and the plaintiff cites no such authority. Accordingly, Officer Smith did not commit a constitutional violation, and even if he did, he would be entitled to qualified immunity. Summary judgment will be granted on this claim.

## J. State-Law Claims

The defendants seek dismissal of the plaintiff's remaining state-law claims on the ground that he did not comply with Wisconsin's notice-of-claim statute before filing this suit. *See* Wis. Stat. § 893.80(1d). To comply with the statute, a plaintiff must satisfy two separate requirements. First, "[w]ithin 120 days after the happening of the event giving rise to the claim," the plaintiff must serve written notice of the circumstances of the claim on the governmental defendant. *Id.* § 893.80(1d)(a). This requirement contains a statutory exception stating that "[f]ailure to give the requisite notice shall not bar action on the claim" if the governmental agency "had actual notice of the claim and the claimant shows to the satisfaction of the court that the delay or failure to give the requisite notice has not been prejudicial" to the agency and the individual defendant. *Id.*

In addition to providing the notice required by subsection (1d)(a), the plaintiff must present "[a] claim containing the address of the claimant and an itemized

statement of the relief sought" to the "appropriate clerk" for the governmental agency. *Id.* § 893.80(1d)(b). The plaintiff must then wait until the claim is disallowed before filing suit. *Id.* Failure of the governmental body to act on the claim within 120 days is deemed a disallowance. *Id.* § 893.80(1g).

The defendants contend that the plaintiff did not comply with either requirement of the notice-of-claim statute. The plaintiff offers several arguments in response. First, he contends that the defendants waived their notice-of-claim defense by not raising it earlier. However, the defendants raised this defense in their answers to the complaint, *see* ECF No. 50 at 26 ¶ 9, ECF No. 71 at 19 ¶ 9, ECF No. 72 at 27 ¶ 9, and therefore they did not waive it.

Second, the plaintiff contends that he actually filed a timely notice of claim with the Milwaukee County Clerk. However, the only evidence he submits on this point is his own declaration, which states that he "mailed Notice of Claims to the Milwaukee County clerk's office timely explaining the claims related to this suit. . . . I didn't get a response like I did the last time, so I assumed they weren't settling. This was June 2011 I think." ECF NO. 449 at 24 ¶ 7. For several reasons, this evidence is insufficient to create a factual dispute over whether he filed a proper notice of claim. First, this statement is primarily a legal conclusion. He states little more than that he filed something he considered to have been a notice of claim in June 2011. But the plaintiff does not identify the contents of this supposed document and therefore has not shown that it complied with the requirements of the statute. Thus, although the plaintiff's declaration may create a fact issue as to whether he filed some document that he thinks was a notice of claim, it does not enable me to determine whether that document was a *proper*

notice of claim.[11] Moreover, the Deputy Milwaukee County Clerk has filed a declaration stating this he has reviewed the clerk's records but could not find any notice of claim that might apply to the claims at issue in this lawsuit. ECF No. 442. Accordingly, the plaintiff has not established an issue of fact as to whether he sent a proper notice of claim to the appropriate entity within 120 days.

Third, the plaintiff contends that he can satisfy the statutory exception to subsection (1d)(a), *i.e.*, that he can show that the defendants had actual notice of his claims and that they have not been prejudiced by any delay. However, even if this were true, it would not save the plaintiff's claims. That is so because the statutory exception only applies to subsection (1d)(a) and does not excuse the plaintiff's failure to comply with subsection (1d)(b), which requires the plaintiff to file a claim with the clerk that includes his address and an itemized statement of the relief sought. Here, the plaintiff has not shown that he complied or substantially complied with subsection (1d)(b) before filing this suit, and for that reason alone his state-law claims must be dismissed. *See Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909, 911 (7th Cir. 1985).

## VI. Further Proceedings on Surviving Claims

To sum up, the plaintiff has survived summary judgment on the following claims: (1) His claim that his right to procedural due process was denied by the defendants' refusal to allow him to call witnesses during disciplinary hearings held on September 29, 2010, February 23, 2011, and March 29, 2011. The defendants to this claim are the

---

[11] I also note that the best-evidence rule would likely prevent the plaintiff from submitting a declaration purporting to identify the contents of the document. *See* Fed. R. Evid. 1001–08. Under this rule, only the actual document can be used to prove its contents unless an exception applies, such as an inability to obtain the document. Here, the plaintiff has not shown that he made any efforts to obtain the purported notice of claim but was unable to do so.

Sheriff in his official capacity, Tricia Carlson, and Melissa Elliott. (2) His claim involving the use of the RIP restraint bed on February 18, 2011. The defendant to this claim is Thomas Trettin. (3) His claim involving use of the urine-soaked restraint belt. The defendants to this claim are Decorie Smith and Deshawn McKinley. (4) His claim involving the use of force at the elevator. The defendants to this claim are Sean Henderson, Michael Leeman, Fatrena Hale, and Sarah Wronski.

Other than these four claims, every claim that Tatum has asserted in this suit has been disposed of, either by Judge Randa in his prior orders or by me in this order. Accordingly, the following defendants will be dismissed: Sheriff Clarke in his personal capacity, Gary Coleman, Patrick Diggins-Davis, Abie Douglas, Justin Georgeson, Mitchell Gottschalk, Charles Holt, Edward Horzewski, Peter Jaskulski, James Koscielak, Kirk Lausterer, Matt Leete, Thomas Liebenthal, Timothy Lorch, Chris Lubus, Denise Luna, Dennis McKnight, Bret Myers, James Novotny, Kevin Nyklewicz, Cheri Schmitz, Calvin Smith, Tina Watts, Leon Woods, any defendant who was sued under a fictitious name, and any defendant that I have not expressly identified as a defendant to one of the four surviving claims.

Each of the four surviving claims are asserted against different defendants or groups of defendants. Thus, they may continue to be prosecuted as part of a single action only if Rule 20(a)(2) is satisfied. But it is not. Each claim arose out of completely distinct transactions and occurrences, and no question of law or fact common to all defendants will arise in the action. Accordingly, if these claims are to proceed, they must be severed into four separate actions under Rule 21: one for the procedural-due-process claims alleged against the Sheriff in his official capacity and Carlson and Elliott

in their personal capacities, one for the claim against Trettin involving the restraint bed, one for the claim involving the urine-soaked restraint belt against Decorie Smith and DeShawn McKinley, and one for the excessive-force claim involving the elevator incident against Henderson, Leeman, Hale, and Wronski.

When a court severs a misjoined claim, the plaintiff is required to pay the filing fee for the severed action. *See Taylor v. Brown*, 787 F.3d 851, 853 (7th Cir. 2015). The plaintiff has already been assessed the filing fee for this action, so one of the four surviving claims may proceed without the plaintiff's paying a new filing fee. However, if the plaintiff wishes to proceed with more than one of these claims, he must pay new filing fees or move to proceed without prepayment of the filing fees for the severed actions. (But I note that because the plaintiff has incurred three "strikes" and cannot plausibly allege that he is under imminent danger of serious physical injury because of events that transpired in 2010 and 2011, almost certainly he will not be allowed to proceed without prepaying the filing fees. *See* 28 U.S.C. § 1915(g); Orders of Feb. 21, 2017 and March 13, 2017 in *Tatum v. Cimpl*, Seventh Circuit Case No. 16-3974.)

Before severing any claims, I will give the plaintiff the option of dropping one or more of his remaining claims so that he does not incur the filing fees for the severed actions. The plaintiff may choose which of the four claims will proceed under the case number for this action, in which he has already been assessed the filing fee. The plaintiff must then identify which, if any, of the other three claims he intends to proceed with in severed actions. If the plaintiff indicates that he wishes to proceed with any of those claims, the court will assess a filing fee for each action. No further proceedings on any case will be scheduled until the plaintiff indicates how he wishes to proceed.

## VII. Motion for Sanctions

The plaintiff has also filed a motion for sanctions under Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927 against the defendants and their attorneys for advancing frivolous and poorly investigated arguments and factual contentions and vexatiously delaying the case. However, I conclude that the defendants have not advanced any frivolous or poorly investigated arguments or factual contentions, and that counsel has not vexatiously delayed the case. Accordingly, the motion for sanctions will be denied.

## VIII. Conclusion

For the reasons stated, **IT IS ORDERED** that the defendants' motion for reconsideration (ECF No. 436) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted insofar as the court considers each and every claim ever asserted in this suit to have been adjudicated against the plaintiff except the four claims identified in Part VI of this opinion. The motion is denied as to those four claims.

**IT IS FURTHER ORDERED** that the plaintiff's motion for sanctions (ECF No. 459) is **DENIED**.

**IT IS FURTHER ORDERED** that the following defendants are dismissed: Sheriff Clarke in his personal capacity, Gary Coleman, Patrick Diggins-Davis, Abie Douglas, Justin Georgeson, Mitchell Gottschalk, Charles Holt, Edward Horzewski, Peter Jaskulski, James Koscielak, Kirk Lausterer, Matt Leete, Thomas Liebenthal, Timothy Lorch, Chris Lubus, Denise Luna, Dennis McKnight, Bret Myers, James Novotny, Kevin Nyklewicz, Cheri Schmitz, Calvin Smith, Tina Watts, Leon Woods, any defendant who

was sued under a fictitious name, and any defendant that I have not expressly identified as a defendant to one of the four surviving claims.

**IT IS FURTHER ORDERED** that the caption of this case be amended to reflect that Earnell R. Lucas, rather than David A. Clarke, Jr., is the defendant to the plaintiff's official-capacity claims.

**IT IS FURTHER ORDERED** that, on or before **March 18, 2019**, the plaintiff shall comply with the instructions in Part VI of this opinion by filing a written statement in which he identifies which of the four surviving claims he wishes to proceed with in this action, and which, if any, he wishes to proceed with in severed actions.

Dated at Milwaukee, Wisconsin, this 15th day of February, 2019.

s/Lynn Adelman
LYNN ADELMAN
District Judge